## ST. LOUIS *v.* RUTZ.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
SOUTHERN DISTRICT OF ILLINOIS.

No. 1096.   Submitted January 5, 1891.—Decided February 2, 1891.

In this case certain land formed by accretion, on the Illinois side of the
Mississippi River, in St. Clair County, Illinois, was held to belong to
the plaintiff, as part of certain surveys in the common fields of Prairie
du Pont, in Illinois, and not to belong to the city of St. Louis, Missouri,
as an accretion to, and part of, an island in that city, called "Arsenal
Island" or "Quarantine Island," on the Missouri side of the river, which
island was originally more than a mile higher up the river than said
surveys.

By the law of Illinois the title of the plaintiff extended to the middle of the
main channel of the Mississippi River.

It is a rule of property in Illinois, that the fee of the riparian owner of
lands in that State bordering on the Mississippi River extends to the mid-
dle line of the main channel of the river.

The terms of the deed which conveyed title to the plaintiff construed as
not limiting him to the line of low water mark on the river.

The sudden and perceptible loss of land on the premises conveyed to the
plaintiff, which was visible in its progress, did not deprive the grantor of
the plaintiff of his fee in the submerged land, nor change the boundaries
of the surveys on the river front, as they existed when the land com-
menced to be washed away.

If the bed of a stream changes imperceptibly by the gradual washing away
of the banks, the line of the land bordering upon it changes with it; but,
if the change is by reason of a freshet, and occurs suddenly, the line
remains as it was originally.

If an island or dry land forms upon that part of the bed of a river which is
owned in fee by the riparian proprietor, the same is his property.

The right of accretion to an island in the river cannot be so extended
lengthwise of the river as to exclude riparian proprietors above or below
such island from access to the river, as such riparian proprietors.

The law of title by accretion can have no application to a movable island,
travelling for more than a mile, and from one State to another, for its
progress is not imperceptible, in a legal sense.

EJECTMENT.   The docket title to this case is *Benjamin
Seeger and the City of St. Louis* against *Edward Rutz.* The
death of Seeger was suggested by counsel on the 5th of Jan-
uary, 1891, and thereupon, an order being entered that the

case proceed in the name of the surviving plaintiff, the cause was on the same day submitted.

The case, as stated by the court, was as follows:

This was an action of ejectment, commenced January 29, 1884, by Edward Rutz against Benjamin Seeger, in the Circuit Court of the county of St. Clair, in the State of Illinois, to recover the possession of certain land situated in said county, described in the first count of the declaration as follows: "Commencing the survey thereof at a point on the line between surveys one hundred and forty-eight (148) and one hundred and forty-nine, in the common fields of Prairie du Pont, from which the southernmost corner of said survey number one hundred and forty-eight, at the bluffs, bears S. 33½° E. (var. 6°) two hundred and forty-nine and $\frac{25}{100}$ (249.25) chains; thence north 33½° W., with said line of said surveys extended, to the centre thread of the Mississippi River; thence along the centre thread of said river to the line between survey one hundred and fifty-six (156) and survey one hundred and fifty-seven (157) extended to said centre thread of said river, making the right-angle distance between the said extended lines 34.60 chains; thence south 33½° E. along said last-mentioned extended line to a point in the line between said surveys one hundred and fifty-six (156) and one hundred and fifty-seven (157) of said common fields, from which the most southern corner of said survey one hundred and fifty-six bears south 33½° east two hundred fifty-four chains distant; thence along the meanders of the original bank of the Mississippi River, as surveyed by the United States government in surveying said common fields, to the point of beginning, with the appurtenances."

Seeger put in a plea of the general issue; and the city of St. Louis, a municipal corporation of Missouri, and the landlord of Seeger, was made, by an order of the court, a co-defendant with Seeger, and was given the sole control and direction of the defence of the suit; and it put in a plea of the general issue. Afterwards, on the petition of the city of St. Louis and

of Seeger, the suit was removed into the Circuit Court of the
United States for the Southern District of Illinois, and that
court took jurisdiction of it.   By a written stipulation filed,
the case was tried by the court without the intervention of a
jury, and the court, held by the district judge, made the fol-
lowing findings of fact:

" 1. That in the years 1849 and 1850 one Augustus A. Blu-
menthal acquired by deeds from the parties then in actual
possession of said premises as the owners thereof, the title in
fee to surveys numbered 149, 150, 151, 152, 153, 154, 155 and
156 of the common fields of Prairie du Pont, in the county of
St. Clair, in the State of Illinois, and that Edward Rutz, the
plaintiff in this suit, acquired from said Blumenthal his said
title to said land prior to the commencement of this suit.

" 2. That the map or plat made by G. F. Hilgard, county
surveyor of St. Clair County, Illinois, produced in evidence
and marked 'Plaintiff's Exhibit B,' is a correct map and plat
of the said premises and the several surveys and lines indicated
thereon; which said map is hereby included in and made a
part of these findings, and to which reference is made for
greater certainty.

" 3. That, as appears from the evidence and plats read and
produced in evidence, the said surveys numbered 149, 150, 151,
152, 155 are each one arpent (or about twelve rods) in width,
and the said surveys 153 and 154 are each two arpents (or
about twenty-four rods) in width, and that the said survey
numbered 156 is three arpents (or about thirty-six rods) in
width, and that said several surveys adjoin each other and lie
side by side in the order the same are respectively numbered,
survey 149 being upon the extreme northerly, and survey 156
being upon the extreme southerly, side of the entire tract, and
that each and all of said surveys extended to and were bounded
by the Mississippi River on the northwesterly ends thereof,
and extend southeasterly from the Mississippi River, the aver-
age distance of about one thousand rods, to the hills or bluffs
on the Illinois side of said river.

" 4. That said Blumenthal, under said deeds to him, whereby
he acquired title to said surveys, in the year 1850 entered

upon and took the actual possession of said surveys, including, as a part thereof, the accretions thereto formed on the river front of said surveys embraced within the side lines of said surveys, extended without deflection in a direct line across such accretions northwesterly to the Mississippi River, and said Blumenthal so held such possession of said premises and paid all taxes thereon each year from January 23, 1850, to December 23, 1873, at which said last-mentioned time said Blumenthal conveyed 500 acres off from the northwestern end of said premises, by deed, to said Edward Rutz and others, whose title the plaintiff acquired in fee on and prior to the 7th day of March, 1883, and thereupon succeeded to said Blumenthal's said title to and possession of said premises; and that the said Blumenthal, from whom the plaintiff so derived such title and possession as aforesaid, and the several owners of the surveys and lands in the said Prairie du Pont common fields adjoining said surveys 149 to 156, both on the northerly and southerly sides thereof, have each, ever since the year 1850, up to the present time, claimed, possessed, fenced, enclosed, used and occupied as a part of their said several surveys and lands, respectively, that portion of the said accretions thereto embraced within the side lines of their respective surveys extended without deflection in direct lines northwesterly to said river; and that ever since the year 1849 the several owners of said surveys have, by common consent, recognized and acted upon such extension of the side lines of their several surveys in a direct course across said accretions to the river, as the true and proper boundary and division lines between them, in respect to the accretions formed on the river front of said surveys.

"5. That the premises described in the declaration and sued for are located at the present time, and were at the commencement of this suit, eastwardly of the centre of the main channel of the Mississippi River, and in the county of St. Clair, in the State of Illinois.

"6. And the court further finds, that, as appears from the evidence and from the survey of said lands made by William L. Deneen, as the county surveyor of St. Clair County, Illi-

nois, on November 15, 1850, produced in evidence, at that time, the dry land of said surveys numbered 149 to 156, inclusive, extended westwardly to the line indicated by the words 'River bank, 1850, by Deneen,' on the map marked 'Plaintiff's Exhibit B;' and that the main land of said surveys numbered 149 to 156, inclusive, in the year 1850, extended westwardly over and across, and included about sixty rods in width of the lands described in the declaration, to wit, that portion of said lands lying between the river bank in 1850, as indicated by said Deneen's survey, and the line marked 'Old surveyed river bank, 1814,' as said lines are respectively designated on said. map; and that in the year 1863, the main and dry lands of the surveys 149 to 156 extended about fifteen chains or sixty rods further westward and beyond the line of the river bank so surveyed by said Deneen in 1850, and that the eastern bank of the river in 1863 was about one-half a mile west of a certain dwelling-house hereinafter mentioned, then standing on said survey No. 151, and so continued until the year 1865.

"7. That the greater part of the so-called Arsenal Island, which now extends over and is embraced within the boundaries of the lands described in the plaintiff's declaration, is located upon the site of the dry lands of said surveys numbered 149 to 156, inclusive, as the same existed from 1850 to 1865, and that the residue thereof (being about one-eighth of the entire width of the same) is located upon the bed of the Mississippi River as it then existed, and easterly of the thread or middle line of said river.

"8. That between the years 1865 and 1873 the river front of the said surveys numbered 149 to 156 was washed away, so that, in July, 1873, the river front of said lands only extended to the line marked 'River bank, 1873,' on said map, and that said river bank thereafter continued to wash away and cave in until it reached the line marked 'River bank, 1884,' on said map.

"9. And the court further finds, from the evidence, that such washing away of said river bank did not take place slowly and imperceptibly; but, on the contrary, the caving in

and washing away of the same was rapid and perceptible in its progress; that such washing away of said river bank occurred principally at the spring rises or floods of high water in the Mississippi River, which usually occurred in the spring of the year; that such rises or floods varied in their duration, lasting from four to eight weeks, before the waters of the river would subside to its ordinary stage or level; that during each flood there was usually carried away a strip of land from off said river bank from two hundred and fifty to three hundred feet in width, which loss of land could be seen and perceived in its progress; that as much as a city block would be cut off and washed away in a day or two; that blocks or masses of earth from ten to fifteen feet in width frequently caved off and fell into the river and were carried away at one time; that in the spring of the year 1872 Mr. Augustus A. Blumenthal, Jr., the occupant of the land at the time, lived in the dwelling-house situated on said survey No. 151, and the river had, since the year 1865, so encroached upon the land that the house was then but about four or five hundred feet back from the river bank and water's edge, as it then existed. When the spring rise or flood occurred that year, the said Blumenthal became alarmed for the safety of his house, and immediately commenced taking said house down and removing the same further from the river bank, and, in so doing, worked 6 or 8 days in succession, at the expiration of which time the bank had caved in and washed away so rapidly that the bank and waters of the river had approached within a few feet of the foundation of the house, and before the waters subsided carried away the greater portion of the foundation of the house, and the flood which came in the spring of 1873 carried away the residue of said foundation, with at least 100 feet more of the land; and that such caving in and washing away continued until the building of the dyke at the point indicated on said map, on the eastern side of the river, above the said lands, which dyke was built by the United States government in the years 1876 to 1878.

"10. That the said washing away of the bank on the front of the said surveys was caused by dykes built by the city of

St. Louis on the western side of the river, at the points where the same are indicated on said map, by causing the current of the river to flow over to and against the eastern shore; that the western bank of the river opposite the plaintiff's said land is rocky, and there appears to have been no material change in that bank since the first survey thereof by the United States government.

"11. The court further finds, that in 1853 there existed an alluvial formation or body of land on the western side of the river and near the Missouri shore, then called Quarantine Island, which, in that year (1853), was surveyed by William H. Cozzens. The location and boundaries of said island are indicated upon said map, the same being shaded red, and having written thereon the words and figures 'Quarantine Island, also called Arsenal Island, as surveyed in 1853.' In 1858 the said island, in low water, extended to and adjoined the main land on the western or Missouri side of the river. At some time between the years 1853 and 1863 the greater portion of said Quarantine Island washed away, so as only to leave remaining that portion thereof embraced within a second survey thereof made by said Cozzens in January, 1863, the location and boundaries of which are indicated upon said map by the words 'Survey No. 411 of St. Louis land, school lands, Arsenal Island, surveyed in 1863;' the letters and lines thereof being shaded green upon said "Exhibit B.'

"12. Said Quarantine Island, since its survey in 1863, has been called Arsenal Island; and at the time of said surveys of said island in 1853 and 1863 the same was situated on the west side of the main channel of the Mississippi River and about a mile higher up the river than the lands described in the declaration, and no part of the same then extended down the river opposite said plaintiff's said lands.

"13. On February 10th, 1863, a part of the said island, designated as 'Survey No. 411 of St. Louis school lands,' containing 109 and twenty-two hundredths acres, was assigned to the St. Louis public schools, in pursuance of the act of Congress of June 13th, 1812, entitled 'An act making further provision for settling the claims of land in the Territory of Mis-

souri' (2 U. S. Stat. at Large, p. 748), and of the supplementary act of May 26th, 1824 (4 U. S. Stat. at Large, p. 66), and the residue of said island, as so surveyed in 1863, being nine and sixty-five hundredths acres on the northern end thereof, appears to have been also assigned to said St. Louis public schools on August 25th, 1864, as indemnity for school lands lost in section 16, T. 45 N., range 7 east, of the St. Louis district, Missouri.

"14. By deed dated February 8th, 1866, the St. Louis public schools conveyed its right and title to said Quarantine or Arsenal Island to the city of St. Louis, which lands are described in such deed as situated 'in the county of St. Louis and State of Missouri.' As early as the year 1850 the city of St. Louis occupied said Quarantine or Arsenal Island for quarantine purposes, and so continued to occupy the same until the year 1875, when the said city of St. Louis leased said island to the defendant, Benjamin Seeger, who, as such tenant, lived on and occupied the said island up to the time of the commencement of this suit. During the years 1861 to 1865, inclusive, the United States government occupied a portion of said island for the purpose of a military hospital and as a place for the burial of those dying at such hospital. The dry land described in the declaration in this case did not arise or form in the Mississippi River until about the year 1874 and subsequent thereto, the same having, after the year 1865 and prior to 1874, become, in part, submerged and washed away in the manner stated in the 8th paragraph of these findings.

"15. The court further finds, from the evidence, that there is not now, and was not at the time of the commencement of this suit, any land whatever above the surface of the water in said river on the site or within the boundaries of said Quarantine Island as so surveyed in 1853, nor upon the site or within the boundaries of said island as so surveyed in 1863, but that the same was subsequently wholly washed away.

"16. The court further finds that, in the floods in the Mississippi River, before mentioned, large portions of the upper or northern end of said island washed away; that in such

floods a bar formed each year below, and joined to the foot of the island, extending down the river for the distance of a quarter of a mile or more; that when the water subsided after such a spring flood the surface of such bar appeared in sight above the surface of the water, but nearly on a level with the water, for the greater length of such bar; that during the first summer after such bar had formed, willows grew upon it, and the flood which occurred the next succeeding spring deposited more sand and soil on the bar, which was retained by the willows, and the bar so formed was thus raised higher, in each successive annual flood, so long as it was overflowed in high water, and this process was repeated at each succeeding flood by the formation of another bar below that formed by the preceding flood, which in turn was covered with a growth of willows and raised higher by each succeeding flood until it ceased to be overflowed.

"17. The court further finds, that such bars were not formed by accumulations of sand or soil washed up against the lower end of the island, but by the deposits, in times of flood, of soil and sediment upon the bed of the river below the island.

"18. And the court further finds, that before the said island was washed away the main and navigable channel of the Mississippi River was eastwardly of the island, but after the said bar was formed lower down the river in front of the plaintiff's land the main and navigable channel of the river has been, and still is, on the west side of the said bars or island, and that since the said bars or island had so formed in the river in front of said surveys the boats navigating the river have not run between the bar or island and the bank of the eastern or Illinois shore of the river.

"19. The court further finds that in the years 1876 to 1878 the United States government built a dyke from the eastern or Illinois shore of the river to the bar or island, as it then existed, about sixty rods northerly, or higher up the river than the north line of the plaintiff's said land, and which said dyke is indicated on said map by the line having the word 'dyke' written beneath the same. And that in the years 1878 to

1882 the United States government built a dam above said dyke from a point near the head of said bar or island to the eastern or Illinois shore, on the line designated 'dam' on said map; and after said dyke and dam were built the flow of the water through the channel or space occupied by water between the said bar or island which had so formed in front of the river bank of plaintiff's land, as it existed at that time, was thereby impeded and the channel or space gradually filled up by deposits from the river, so that by the year 1884 the same became dry land from the line in front of the said surveys 149 to 156, marked 'River bank, 1884,' out to the western side of the said bar or island on the northwestern end of said surveys, as indicated on said map, and that the same has since continued to be and is now dry land, except in extremely high water, and that the lands described in the declaration embrace so much thereof as lies westerly of the line marked on said map with the words 'Old surveyed river bank, 1814,' and easterly of the middle or thread of the main channel of the Mississippi River, and between the extended lines of said surveys, as indicated on said map marked 'Plaintiff's Exhibit B.'

"20. The court further finds, that the plaintiff is, and was on and prior to the first day of January, A.D 1884, and at the time of the commencement of this suit, the owner in fee of said lands described in the first count of the declaration, situated in the county of St. Clair and State of Illinois, and that the defendants are guilty of unlawfully withholding the possession thereof from the plaintiff, in manner and form as alleged in the declaration.

"21. And that the value of the said lands in controversy in this suit exceeds sixteen thousand dollars."

On these findings, the court entered a judgment which found that the defendants were guilty of unlawfully withholding from the plaintiff the premises above described; and that the plaintiff, at the time alleged in the declaration, owned the lands in fee; and adjudged that he recover the possession of them in fee from the defendants, according to the finding of the court. A motion for a new trial was made and overruled.

There was in the record a bill of exceptions, which showed

that at the trial the defendants moved the court to make the findings of fact and declarations of law which are set forth in the margin,[1] but that the court overruled such motion and the

---

[1]*Defendants' Rejected Findings of Fact.*

This is an action of ejectment instituted in the State Circuit Court of St. Clair County, Illinois, on January 29, 1884, to recover certain premises alleged to be in St. Clair County, Illinois, and described as follows, to wit: Bounded east by the meanders of the original bank of the Mississippi River, as surveyed by the United States government and established in United States surveys 149 to 156, inclusive, of the common fields of Prairie du Pont; bounded west by the centre thread of the Mississippi River; bounded north by the north line of survey 149 aforesaid, produced westwardly to the centre thread of the Mississippi River; and south by the south line of survey 156 aforesaid, produced westwardly to the centre thread of the Mississippi River.

The action was originally commenced against Benjamin Seeger, alleged to be in possession, and, subsequently, the city of St. Louis, a municipal corporation existing under the laws of the State of Missouri, claiming to be the owner of the premises occupied by said Seeger and the landlord of said Seeger was, on its motion, made co-defendant, and, afterwards, the cause, on the application of said defendants, was duly removed into this court.

At the trial of this cause before the court, a jury being waived, it appeared that one Blumenthal, in 1849, took possession, under deeds from Dushanan, Lacroix and Pensoneau, of surveys 149 to 156, inclusive, of the common fields of Prairie du Pont, St. Clair County, Illinois, and paid taxes thereon until 1873, when he conveyed to the plaintiff and others, under whom the plaintiff now claims. The deed from Blumenthal, on which the title and possession of plaintiff now rests, describes the property as bounded northwestwardly by low-water mark of the Mississippi River.

It appeared that Blumenthal, in 1849, took possession, under his deeds, of the property mentioned therein, and that his actual possession never extended further west than the easterly edge of the Mississippi River, and that the plaintiff succeeded to the said possession of Blumenthal prior to the commencement of this action. It appeared that between 1814 and 1850 the Mississippi River in front of the property receded in a westerly direction, so that surveys 149 to 156, inclusive, gained forty acres of ground, and that from 1850 to the present time the river has encroached on the premises so that the same have lost one hundred acres of ground, the net loss being sixty acres of ground.

It appeared that an approved survey of Arsenal, then Quarantine Island, was made by William H. Cozzens, in 1853, under the instructions of the U. S. Surveyor General; also, that said island was assigned by the Secretary of the Interior to the St. Louis public schools, in 1863 and 1864. The first assignment bears date February 10, 1863, and covers 109.92 acres of the island. The second assignment is dated September 8, 1864, and conveys

defendants excepted. The bill of exceptions stated that no declaration of law was given by the court, except so far as the

---

9.65 acres. The two assignments embrace the entire island, which contained 119.57 acres; also, that said island was sold and conveyed by the public schools for the sum of $32,000 to the city of St. Louis, in 1866; also, that surveys of the island were made in 1853, 1863, 1881 and 1883, showing its location at these various periods. Witnesses were produced who had known the island as early as 1847. The island was originally in the city of St. Louis and state of Missouri, opposite the arsenal and west of the main channel of the river and of the centre thread of the river. It has moved south and westwardly. The change effected in the location of the island since 1847 has been gradual in its character, and has been caused by the action of the water of the river washing the head of the island and adding new ground to the foot thereof. The city of St. Louis has been in possession of the island from 1850 to the present time. The defendant Seeger occupies the island as the tenant of the city of St. Louis. He cultivates the land and resides thereon. Since 1847, Arsenal Island has always existed as an island in the Mississippi River.

The island existing at the commencement of this action is the same island that existed in 1847, except that its location had changed as above stated, and it had become attached to the Illinois shore, in the manner hereinafter stated. At no time had the island ceased to exist. Prior to 1874 the navigable channel of the Mississippi River was between Arsenal Island and the Illinois shore.

In 1874 boats commenced navigating between the island and the Missouri shore. In or about the years 1878 to 1882 the United States government caused to be constructed a stone dyke leading from the head of the island to the Illinois shore, and subsequently a dam south of the dyke, between the island and the Illinois shore. The effect of these structures has been to stop the flow of water at low water between the island and the Illinois shore, and, as a necessary result, land has been created connecting the island with the Illinois shore in front of the Prairie du Pont common fields. During the yearly stage of high water the water flows between the island and the Illinois shore, and at the date of the trial — July 5, 1888 — it was so flowing.

### Defendants' Refused Declarations of Law.

1. The court declares the law to be, that, under the facts in this cause, the plaintiff has shown no title to the premises known as Arsenal Island at and prior to the commencement of this action, and the judgment, therefore, must be for the defendants.

2. The court declares the law to be, that, under the facts in this cause, the plaintiff has exhibited no title to the bed of the Mississippi River beyond low-water mark in front of surveys 149 to 156, inclusive, of the common fields of Prairie du Pont.

3. The court declares the law to be, that, under the facts in this cause,

same may be included in the findings which the court made; and that the defendants excepted to the findings of fact made

---

Arsenal Island is not an accretion to plaintiff's land and the plaintiff has no claim to the ownership of said island or any part thereof under the law of accretion.

4. The court declares the law to be, that the title to Arsenal Island held by the city of St. Louis under the United States, and the possession of said premises by said defendant, extending from 1850 to the present time, have not been divested by the movement of the island in the Mississippi River.

5. The court declares the law to be, that the deed of Augustus A. Blumenthal and wife to Edward Rutz and others, introduced in evidence, did not convey title to the bed of the Mississippi River beyond low-water mark in front of surveys 149 to 156, inclusive, of the common fields of Prairie du Pont, except to the accretion or sand-bar lying northwestwardly and between the extended lines of said surveys.

6. The court declares the law to be, that if the property known as Arsenal Island was granted by the United States to the public schools of the city of St. Louis, and that at the time of such grant the same was an island in the Mississippi River situate in the State of Missouri, then the ownership of accretions attaching themselves to such island while said island remained in said State is governed by the laws of the State of Missouri; and if said island was situated entirely up-stream a mile, or two miles, north of the northernmost point of land of the plaintiff fronting on the Mississippi River, and if accretions thereupon formed at the lower or down-stream end of said island in said State until they reached a point opposite to or in front of the river front of the plaintiff's land, or between the extended lines of his surveys 149 to 156 described in the declaration, such accretions became and were the property of the owner of the island shore to which they had become attached, and the title of such owner is not divested by the fact that the navigable channel of the Mississippi River changed its course so as to run between said island and the eastern shore of the State of Missouri, and the further fact that, by means of a dyke and a dam run out from the east shore of the Mississippi River (the Illinois shore) said island has become attached to the Illinois shore, and the intervening space has been filled up by deposits of mud, so that, except in high stages of water, there is no water running between said island and the Illinois shore of said river.

7. The court declares the law to be, that if the current of the Mississippi River undermined the west shore or bank of the land of the plaintiff or of his grantor, Blumenthal, fronting on the Mississippi River, and that by reason thereof perceptible pieces of the shores and banks of said land fell into the river and were washed away, whereby the bed of the river was changed, thereby the west boundary line of the land of the plaintiff or of his grantor changed accordingly, and to correspond with the changes in the bed and centre thread of said river opposite said land,

by the court, and to the rendering of judgment for the plaintiff, and to the overruling of the motion for a new trial.

Seeger and the city of St. Louis sued out a writ of error from this court to review the judgment. During the pendency of the writ of error in this court, Seeger died, and the city of St. Louis is the surviving plaintiff in error.

*Mr. Leverett Bell* and *Mr. W. C. Kœffner* for plaintiff in error.

I. Under the law of France, in force when the original grant of the Prairie du Pont Common Fields was made in the year 1722, no title passed by the terms of said grant to the bed of the Mississippi River.

II. Under a proper application of the doctrines of the common law, the title of the owner of land on the Mississippi River terminates at the water's edge, and does not extend to the centre of the river. *Railroad Co.* v. *Schurmeir,* 7 Wall. 272; *Barney* v. *Keokuk,* 94 U. S. 324; *Rundle* v. *Delaware &*

8. The court declares the law to be, that the boundary line between the States of Illinois and Missouri is the centre thread of the Mississippi River.

9. The court declares the law to be, that if accretions formed and attached themselves to the down-stream end of Arsenal Island, in the State of Missouri, and thereafter other accretions attached themselves to the first-mentioned accretions on the east side of the island, toward the Illinois shore, the last-mentioned accretions belong to the owner of the first accretions, notwithstanding they extended eastwardly of the centre thread of the river.

10. The court declares the law to be that, if a sand-bar extended south-westwardly from the foot of Arsenal Island, in the State of Missouri, and subsequently accretions attached themselves to the east side of said sand-bar and extended eastwardly across the centre thread of the river into the State of Illinois, the owner of the island was and is the owner of said sand-bar and said accretions.

11. The court declares the law to be, that if the current of the Mississippi River gradually undermined the west shore or bank of the land of the plaintiff or of his grantor, Blumenthal, fronting on the Mississippi River, and that by reason thereof perceptible pieces of the shores and banks of said land fell into the river and were washed away, whereby the bed of the river was gradually changed, thereby the western boundary line of the land of the plaintiff or said grantor changed accordingly to correspond with the changes in the bed and centre thread of the river opposite said land.

*Raritan Canal Co.*, 14 How. 80; *The Daniel Ball*, 10 Wall. 557; *The Montebello*, 20 Wall. 430; *Carson* v. *Blazar*, 2 Binney, 475; *S. C.* 4 Am. Dec. 463; *Cates* v. *Wadlington*, 1 McCord (Law) 580; *S. C.* 10 Am. Dec. 699; *Wilson* v. *Forbes*, 2 Devereaux (Law) 30; *Bullock* v. *Wilson*, 2 Porter (Ala.) 436; *Elder* v. *Burrus*, 6 Humphreys, 358; *Canal Commissioners* v. *People*, 5 Wend. 423; *People* v. *Canal Appraisers*, 33 N. Y. 461; *Benson* v. *Morrow*, 61 Missouri, 345.

III. Under the terms of the deed from Blumenthal, the title of the defendant in error terminated at low-water mark of the Mississippi River. *Middleton* v. *Pritchard*, 3 Scammon, 510; *S. C.* 38 Am. Dec. 112; *Buttenuth* v. *St. Louis Bridge Co.*, 123 Illinois, 535.

IV. The premises in dispute are the property of the city of St. Louis.

The present location of Arsenal Island is due to the action of the currents of the river, and the island, as it now exists, was created by accretion to the original island. It is settled law that land bounded by the Mississippi River is entitled to the accretion attaching to it. *New Orleans* v. *United States*, 10 Pet. 662; *Jones* v. *Soulard*, 24 How. 41; *St. Clair County* v. *Lovingston*, 23 Wall. 46.

The above doctrine applies to the islands in the river, as well as to the main shore. *Benson* v. *Morrow*, 61 Missouri, 345; *Buse* v. *Russell*, 86 Missouri, 209.

In a case lately decided here, *Jefferis* v. *East Omaha Land Company*, 134 U. S. 178, it is held that the general law of accretion is applicable to land on the Mississippi and Missouri rivers. This view excludes the idea that the bed of said rivers is the property of the adjoining proprietors fronting thereon. It overthrows the rule of the Supreme Court of Illinois that has prevailed in that State from 1842 to the present day on the subject. It decides the present controversy in favor of the plaintiffs in error.

The case also decides that the water line is the boundary of a lot fronting on the river, and remains the boundary no matter how it shifts, and the conveyance of the land conveys the accretion thereto.

It is a matter of which the court will take judicial cognizance that it is seldom that accretion on the Mississippi and Missouri rivers is imperceptible. Bottom lands are added to, or swept away by the acre. This fact makes no change in the rule. The proprietor always holds to the water line; no more, no less.

*Mr. James K. Edsall* for defendant in error. *Mr. Alonzo S. Wilderman* also filed a brief for the same.

Mr. JUSTICE BLATCHFORD, after stating the case, delivered the opinion of the court.

The general question involved in the case is, whether the land in dispute is a part of surveys 149 to 156, inclusive, in the common fields of Prairie du Pont, with the accretion thereto, situate on the Illinois side of the Mississippi River, in St. Clair County, Illinois, and is owned by the plaintiff, or whether it is owned by the surviving defendant, the city of St. Louis, as an accretion to, and part of, an island in that city, called "Arsenal Island" or "Quarantine Island," on the western or Missouri side of the Mississippi River, which was originally an island more than a mile higher up the river than the surveys in question.

The assignments of error made are, that the Circuit Court, erred (1) in holding that the title and ownership of the plaintiff extended to the middle of the main channel of the Mississippi River and embraced the premises in controversy; and (2) in refusing to hold that the premises in controversy were an accretion to Arsenal Island, and the property of the city of St. Louis.

We cannot review the action of the Circuit Court in finding the facts which it did find and refusing to find the facts which it was asked to find and did not find. We can only inquire whether the facts found are sufficient to support the judgment. The "defendants' refused declarations of law" do not appear to have been based upon the facts found by the court, but upon the defendants' proposed findings of fact, which were rejected by the court. These "refused declarations of law" contained mixed questions of law and fact; and where

such questions are submitted to the court in a trial without a jury, this court will not, on a writ of error, review such questions, any more than it will pure questions of fact.

The question as to whether the fee of the plaintiff, as a riparian proprietor on the Mississippi River, extends to the middle thread of the stream, or only to the water's edge, is a question in regard to a rule of property, which is governed by the local law of Illinois. *Barney* v. *Keokuk,* 94 U. S. 324, 338; *St. Louis* v. *Myers,* 113 U. S. 566; *Packer* v. *Bird,* 137 U. S. 661. In *Barney* v. *Keokuk* it is said, that if the States "choose to resign to the riparian proprietor rights which properly belong to them in their sovereign capacity, it is not for others to raise objections."

The Supreme Court of Illinois has established and steadily maintained, as a rule of property, that the fee of the riparian owner of lands in Illinois bordering on the Mississippi River extends to the middle line of the main channel of that river. *Middleton* v. *Pritchard,* 3 Scammon, 510; *Braxon* v. *Bressler,* 64 Illinois, 488; *Houck* v. *Yates,* 82 Illinois, 179; *Cobb* v. *Lavalle,* 89 Illinois, 331; *Lavalle* v. *Strobel,* 89 Illinois, 370; *Washington Ice Company* v. *Shortall,* 101 Illinois, 46; *Village of Brooklyn* v. *Smith,* 104 Illinois, 429, 438; *Trustees of Schools* v. *Schroll,* 120 Illinois, 509, 518, 519; *Buttenuth* v. *St. Louis Bridge Company,* 123 Illinois, 535, 550.

The findings of fact by the court make no specific reference to a deed dated December 23, 1873, from Augustus A. Blumenthal and wife to the plaintiff and others, the substance of which is set forth in the bill of exceptions, but state merely that Blumenthal acquired by deeds the title in fee to surveys 149 to 156, and that the plaintiff acquired from Blumenthal "his said title to said land prior to the commencement of this suit."

The defendant, however, refers to the deed of December 23, 1873, and relies upon the fact that the description of the premises contained in it describes the line between surveys 148 and 149 as running north 33½ degrees west, 142.51 chains "to the present bank of the Mississippi River," thence along the extended line between surveys 148 and 149, north 33½ degrees

west, "to low-water mark of the Mississippi River," and "thence down to the extended line between surveys" 156 and 157. The description further says: "The tract hereby conveyed containing 500 acres, more or less; together with all rights as riparian owner to the accretion or sand-bar lying northwestwardly and between the extended lines of said land herein described, situated in the county of St. Clair and State of Illinois." The deed also describes the property conveyed as "being the northwestern part of surveys numbered" 149 to 156, both inclusive, in the Prairie du Pont common fields.

The contention of the defendant is, that this deed did not convey to the grantees the fee of the bed of the river beyond low-water mark. But we think this contention is erroneous. In construing the deed, all the words of the description must be given effect, if possible. The property conveyed is described as "the northwestern part of surveys" numbered 149 to 156. This makes it impossible that the grantor should retain the ownership of any part of the surveys northwest of that which he conveyed to his grantees. Again, the description, after saying "to low-water mark of the Mississippi River," does not say "thence down low-water mark to the extended line between surveys" 156 and 157, but says only "thence down to the extended line between surveys" 156 and 157. The word "down" properly means down the river. As was said in *County of St. Clair* v. *Lovingston*, 23 Wall. 46, 64, "where the calls in a conveyance of land are for two corners at, in or on a stream or its bank, and there is an intermediate line extending from one such corner to another, the stream is the boundary, unless there is something which excludes the operation of this rule by showing that the intention of the parties was otherwise." Here the next preceding call was a point at "low-water mark of the Mississippi River," and the next call was an intermediate line "down to the extended line between surveys" 156 and 157, without specifying whether it was down the river generally or down the line of low-water mark. This description made the river the boundary of the surveys on their northwestern ends, although the termination of the last preceding call was at low-water mark of the river.

The river always had been the boundary of the surveys on their northwestern ends; and there is nothing to show that the parties to the deed intended to make anything but the river the boundary at the northwestern end of what the deed conveyed.

It is plain that the fee of Blumenthal in the surveys extended to the middle of the river; and the contention of the defendant is, that Blumenthal, instead of conveying by the deed all the land which he owned on the northwestern end of the surveys, conveyed only to low-water mark. This would be repugnant to that clause of the description which conveys "the northwestern part of surveys" 149 to 156. Then we have the description "together with all rights as riparian owner to the accretion or sand-bar lying northwestwardly and between the extended lines of said land herein described, situated in the county of St. Clair and State of Illinois." These words show that the grantor intended to convey all his riparian rights appurtenant to the surveys, "between the extended lines" of them, in the county of St. Clair; and it cannot be held, consistently with the terms of the deed, that he intended to retain to himself any interest in the fee of the bed of the river. The accretion or sand-bar mentioned in the deed evidently existed at its date, and it was the nucleus of the bar which subsequently developed into the land in dispute. If the boundary terminated at low-water mark on the margin of the river, it could not have included all the rights of the grantor as riparian owner to the accretion or sand-bar lying northwestwardly in the river opposite the surveys. *Piper* v. *Connolly*, 108 Illinois, 646.

The finding by the court that the plaintiff acquired from Blumenthal, prior to the commencement of the suit, Blumenthal's title to the premises in question, which title was one in fee to such premises, acquired by him by deeds from the parties then in their actual possession as owners thereof, amounts to a finding that the accretion or sand-bar mentioned in the deed of December 23, 1873, was the same sand-bar which first appeared earlier in 1873, and which by subsequent accretions developed into the land in controversy. This find-

ing is conclusive to show that the land conveyed by Blumenthal was not limited by the line of low-water mark on the river. It does not appear that Blumenthal or any one claiming under him asserted any interest in the land after the making of the deed. *Jefferis* v. *East Omaha Land Company,* 134 U. S. 178, 197.

The next question concerns Arsenal Island. By findings of fact 6 to 9 the sudden and perceptible loss of land on the premises conveyed to the plaintiff, which was visible in its progress, did not deprive Blumenthal, as riparian proprietor, of his fee in the submerged land, nor in any manner change the boundaries of the surveys on the river front, as they existed in 1865, when the land commenced to be washed away.

It is contended by the defendant, not only that the plaintiff never had any title to the bed of the river, but that, when the dry land of which he was in possession was swept away by the river and ceased to exist, his ownership of that land also ceased to exist. It is laid down, however, by all the authorities, that, if the bed of the stream changes imperceptibly by the gradual washing away of the banks, the line of the land bordering upon it changes with it; but that, if the change is by reason of a freshet, and occurs suddenly, the line remains as it was originally. This principle is recognized by the Supreme Court of Illinois, in *Buttenuth* v. *St. Louis Bridge Company,* 123 Illinois, 535, 546, in these words: "The law, as stated by law writers, and in the adjudged cases, seems to be, that where a river is declared to be the boundary between States, although it may change imperceptibly, from natural causes, the river, as it runs, continues to be the boundary. But if the river should suddenly change its course, or desert the original channel, the rule of law is, the boundary remains in the middle of the deserted river bed." It is laid down by all the authorities, that, if an island or dry land forms upon that part of the bed of a river which is owned in fee by the riparian proprietor, the same is the property of such riparian proprietor. He retains the title to the land previously owned by him with the new deposits thereon.

It may be asked, pertinently, what has become of the riparian rights of the plaintiff on the river, if his title to the land in dispute is not sustained? It appears by the findings, that the greater part of the so-called Arsenal Island, which is now embraced within the boundaries of the land sought to be recovered by the plaintiff, is located upon the site of the dry land of surveys 149 to 156, as the same existed from 1850 to 1865, and that the residue thereof, being about one-eighth of the entire width of the island, is located upon the bed of the Mississippi River as it then existed, and eastwardly of the thread or middle line of the river; that, between 1865 and 1873 the river front of the surveys was washed away to the extent mentioned in finding 8, and was further washed away thereafter until 1884; and that such washing away did not take place slowly and imperceptibly, but was rapid and perceptible in its progress, and the particulars are given in finding 9. The plaintiff was a riparian proprietor on the river. If his title to the land in question is not sustained, he is no longer such riparian proprietor and is cut off from access to the river. Among his rights as a riparian owner are access to the navigable part of the river from the front of his land, and the right to make a landing, wharf, or pier, for his own use or the use of the public. *Dutton* v. *Strong*, 1 Black, 23; *Railroad Company* v. *Schurmeir*, 7 Wall. 272; *Yates* v. *Milwaukee*, 10 Wall. 497, 504.

No act has been done, or negligence committed, by the plaintiff or his grantor, which occasioned any loss of the land or any transfer of the title to it, either to the State of Illinois or to the city of St. Louis. Finding 10 shows that the washing away of the bank of the surveys was caused by dikes built by the city of St. Louis on the western side of the river, which caused its current to flow to and against the eastern shore. When land was formed again on the place where the plaintiff's land had been washed away, it became the property of the plaintiff, and although the land thus newly formed extended a short distance into the old bed of the river beyond the former shore line, such additional formation belonged to the plaintiff as a deposit on that part of the bed of the river which was

owned by him in fee, and not to the State of Illinois or to any third party. Otherwise, the plaintiff would be cut off without his fault from the river front and from his riparian rights.

When the United States government, from 1876 to 1878, as found in finding 19, built the dike from the eastern shore of the river to the bar or island as it then existed, above the north line of the plaintiff's land, the result was, that the space or channel of water between the bar or island as it had formed in front of the river bank of the plaintiff's land, and the eastern bank of the river as it existed when the cutting away of the plaintiff's land ceased, was filled up, so that by 1884 it had become dry land, and it has since continued to be such on the front of the plaintiff's land out to the western side of the island or land in question. The fact that more land has thus been restored to the plaintiff than was cut away, cannot deprive him of his riparian right or of his access to the river. The State of Illinois does not claim any part of such land, but concedes to the riparian proprietor the bed of the river where the land formed.

It is found by findings 17 and 18, that the bars which formed below and were joined to the foot of Arsenal Island were not formed by accumulations of soil washed up against its lower end, but by the deposit, in times of flood, of soil and sediment on the bed of the river below the island; that, before the island was washed away, the main and navigable channel of the river was eastwardly of the island, but after the bar was formed lower down the river in front of the plaintiff's land, the main and navigable channel of the river was removed to the west side of the bar or island, and since that time boats navigating the river have not run between the bar or island and the eastern shore of the river. It, therefore, appears, that the dry land in question was formed on that part of the bed of the river which was owned in fee by the plaintiff, or his grantor, as the riparian owner, and that their rights were governed by the established rules of law in force in Illinois. It is well settled that the owner in fee of the bed of a river, or other submerged land, is the owner of any bar, island or dry land which subsequently may be formed thereon. *Mulry* v. *Norton.* 100 N. Y. 424.

It is shown by the findings of the court that the space which was covered by water between the front of the plaintiff's dry land and the bar or island, when the latter first was formed, has since been so filled up by deposits from the river that by the year 1884 it was all dry land on the river front of the plaintiff's land out to the western side of the land in question, except in high water. Therefore, when the bar or island formed in front of Blumenthal's land, within the boundaries over which such land extended prior to 1865, the bar or island which was so formed continued to be the land of Blumenthal, notwithstanding a part of it extended farther westward than the boundary of his dry land in 1865. It was formed upon that part of the bed of the river which was owned in fee by Blumenthal and the plaintiff, and continued in such ownership after it became dry land.

The land described in the declaration is on the eastern side of the Mississippi River, in the county of St. Clair and State of Illinois. The land to which the city of St. Louis acquired title was on the western side of the Mississippi River, more than a mile higher up the river, and situated in the city of St. Louis, in the State of Missouri. The only possible claim of the city of St. Louis to the land is based on the act of June 13, 1812, 2 Stat. 748, and on section 2 of the act of May 26, 1824, 4 Stat. 66, and on section 2 of the act of January 27, 1831, 4 Stat. 435. By the terms of those acts, the village of St. Louis was authorized only to acquire title to lands within said village, in the Territory (or State) of Missouri; and it obtained no right thereby to acquire title to land in the State of Illinois.

The enabling act of April 18, 1818, 3 Stat. 429, § 2, under which Illinois was organized as a State and admitted into the Union, made "the middle of the Mississippi River" the western boundary of the State. The enabling act of March 6, 1820, 3 Stat. 545, § 2, under which Missouri was organized as a State and admitted into the Union, made the "middle of the main channel of the Mississippi River" the eastern boundary of Missouri, so far as its boundary line was coterminous with the western boundary of Illinois. It has been held by the Supreme Court of Illinois, *Buttenuth* v. *St. Louis Bridge Co.*,

123 Illinois, 535, that these two enabling acts are to be con strued as *in pari materia*, and that the common boundary line between Missouri and Illinois is the " middle of the main channel of the Mississippi River." The " middle of the main channel of the Mississippi" has been constantly treated as the eastern boundary of the State of Missouri. *Jones* v. *Soulard*, 24 How. 41; *The Schools* v. *Risley*, 10 Wall. 91.

It follows that an island in the Mississippi River, in its course between Illinois and Missouri, must lie wholly in one of those States or the other, because the main channel of the river must run on one side or the other of such island. Arsenal Island, to which the city of St. Louis acquired title, was on the Missouri side of the river in 1863 and 1864, and wholly within that city. The land described in the declaration was never in the city of St. Louis or in the State of Missouri. This follows from the facts stated in finding 18.

The title of the St. Louis Public Schools to the island is set forth in finding 13, and was acquired in 1863 and 1864, under the Cozzens survey of 1863, mentioned in finding 11. By finding 14, the title of the St. Louis Public Schools in the island was conveyed, in 1866, to the city of St. Louis by a deed which is stated in such finding to have described it as situated " in the county of St. Louis and State of Missouri." The land described in the declaration, a mile lower down the river and situated in the State of Illinois, on the other side of the river, is manifestly not the land to which the city of St. Louis so acquired title. Dry land which should again form on the site where Arsenal Island existed when it was surveyed in 1863 would be the property of the city of St. Louis. *Mulry* v. *Norton*, 100 N. Y. 424. In such event, could the city hold both tracts of land, a mile distant from each other? Of course it could not.

The city of St. Louis, by virtue of its original title to the island, is still the owner in fee of the submerged site where the island existed before it was washed away. As its right under the acts referred to, to acquire land was limited to land situated within the boundaries of the city and on the west side of the middle of the river, it cannot acquire, indirectly and by

implication or construction of law, land which it was not authorized to acquire directly and in pursuance of law. Nor is the land described in the declaration an accretion to the land in Missouri which the city of St. Louis acquired, a mile higher up the river, because the middle of the main channel of the river is the eastern boundary of the State of Missouri, and the land described in the declaration is east of the middle of the main channel of the river. The title to land acquired by accretion is a title acquired under the operation of the law of the State, which each State determines for itself. *Barney* v. *Keokuk*, 94 U. S. 324.

As the law of Illinois confers upon the owner of land in that State which is bounded by, or fronts on, the Mississippi River, the title in fee to the bed of the river to the middle thereof, or so far as the boundary of the State extends, such riparian owner is entitled to all islands in the river which are formed on the bed of the river east of the middle of its width. That being so, it is impossible for the owner of an island which is situated on the west side of the middle of the river, and in the State of Missouri, to extend his ownership, by mere accretion, to land situated in the State of Illinois, the title in fee to which is vested by the law of Illinois in the riparian owner of the land in that State.

We must not be understood as implying, that if an island in the Mississippi River remains stable in position, while the main channel of the river changes from one side of the island to the other, the title to the island would change, because it might be at one time on one side and at another time on the other side of the boundary between two States.

The right of accretion to an island in the river cannot be so extended lengthwise of the river as to exclude riparian proprietors above or below such island from access to the river, as such riparian proprietors. *Mulry* v. *Norton*, 100 N. Y. 424, 436, 437. It appears from the map, "Exhibit B," that the so-called Arsenal Island extended as far down the river as is shown on that map, which was made from surveys in 1873 and 1884; and if the plaintiff thereby has lost such newly-formed land and been deprived of access to the river in front

of his surveys, then all the riparian proprietors down the river, as far as the bars have formed or may form hereafter in front of their land, must lose their titles and surrender them to the city of St. Louis, as a part of Arsenal Island. Such rapid changes in these alluvial formations cannot transfer title from one proprietor to another.

This Arsenal Island was the subject of the case of *Carrick* v. *Lamar*, 116 U. S. 423, and in the opinion in that case is described as "a mere moving mass of alluvial deposits." To such a movable island, travelling for more than a mile and from one State to another, the law of title by accretion can have no application, for its progress is not imperceptible, in a legal sense.

As it is found by finding 16, that the bar formed at the foot of the island in the flood of a single year extended down the river for the distance of a quarter of a mile or more, in front of the surveys in question, and such bar subsequently appeared as a part of the so-called Arsenal Island, the question arises as to when the transfer of it passed, if it did pass, from the plaintiff to the city of St. Louis. Whenever it occurred, whether when the sediment first commenced to form a deposit on that part of the bed of the river, or whether when it formed a bar which, though still submerged, could be discerned by soundings, or whether when it came so near to the surface that its extent could be discerned by navigators, or whether when it arose above the surface and became dry land, there must have been, in order to maintain the contention of the defendant, an instantaneous transfer of a quarter of a mile of land from the plaintiff to the city of St. Louis, at one and the same moment of time. Such a transfer was not a title by accretion, within the meaning of the law on that subject.

*Judgment affirmed.*