MARK M. SHELDON, Appellant, v. CLAYTON CHAMBERS et al.,
Appellees.

No. 43866.

SEPTEMBER 27, 1938.

Genung & Genung, for appellant.

Thornell, Thornell & Nichols and A. L. Chantry, for appellees.

DONEGAN, J.—This action was instituted by plaintiff to quiet title to land described as lying west of the public highway in the Southeast quarter of section 30, Township 70, North, Range 43, West of the Fifth P. M.; and to land described as lying west of the public highway in the South Half of the Northeast quarter of Section 30, Township 70, North, Range 43, West of the Fifth P. M.; which described land comprised 20 acres, more or less; and also to establish ownership and quiet title to lands lying west of the land above described and extending from the west boundary thereof to the Missouri river. There is no dispute as to the plaintiff's ownership and title to all of the land described by

him as situated in the Southeast quarter and the South Half of the Northeast quarter of said Section 30. The controversy is as to the title and ownership of the lands west of the Southeast quarter and the South Half of the Northeast quarter. Plaintiff claims these lands as accretions to the lands above described, and as to which his ownership is admitted.

Plaintiff acquired title to the land lying west of the public highway in the Southeast quarter and the South Half of the Northeast quarter of Section 30 from one Lorena Leeka, by deed executed on or about the 6th day of October, 1927, and filed in the office of the recorder of Fremont county on October 17, 1927. After the specific description, by section, township and range, of the lands conveyed, the deed contained this statement: ''Comprising Twenty (20) Acres more or less and all accretions accruing to the above described land.''

The defendants, Clayton Chambers and Harve Moore, claim ownership in separate tracts situated to the westward of the land specifically described in plaintiff's deed. The land claimed by the defendant, Moore, is in the Southeast quarter of the Northwest quarter of said Section 30, and lies west of the land owned by plaintiff in the South half of the Northeast quarter of said section. The land claimed by the defendant, Chambers, is the Southwest quarter of the Southwest quarter of said Section 30 (also described as Lot 4 of said section), and the Northwest quarter of the Southwest quarter of said Section 30; and all of this land claimed by Chambers lies to the westward of the land owned by plaintiff in the Southeast quarter of said section. There seems to be no dispute in the record that the above defendants have a record title to the land claimed to be owned by them, extending backward to the time it was conveyed to the State of Iowa by patents of the United States Government. The plaintiff's contention as to the defense based upon such record titles is, that the lands covered by such titles were eroded by action of the Missouri river and ceased to exist as lands in place, and that ownership in said lands terminated when such lands became a part of the Missouri river. The defendants' response to this claim is: 1. That the lands claimed by them never eroded, but were always lands in place; 2. That, if the lands originally in place ever eroded, the accretions now occupying the situs of such eroded lands accreted to and belong to lands lying to the west-

ward, which were always in place, and not to the lands of plaintiff.

Upon the trial of the case the district court confirmed the plaintiff's ownership in the land specifically described in his deed from Lorena Leeka as lying west of the public highway in the Southeast quarter and the South Half of the Northeast quarter of Section 30, and also in a tract of approximately one acre in the Southeast corner of the Southwest quarter of Section 30. But the court found that the lands claimed by plaintiff as accretions to the said described lands were not accretions; that said lands are lands in place; that they had not been washed away by the river; and that the plaintiff was not entitled to any of the land west of the described land. The court also found that the defendants, Chambers and Moore, were owners of lands claimed by them and quieted their title thereto. From this decree the plaintiff has appealed.

There appears to be little, if any, dispute between the parties as to the law involved in this case. The principal controversy has to do with the facts. If the facts be as claimed by the appellant, then we do not understand that the appellees rely on any law that would deprive him of the relief prayed. On the other hand, if the facts be as claimed by the appellees, there can be no question but that, under the law, the decree of the trial court must be sustained. It becomes necessary, therefore, to direct our attention to the facts shown by the record.

It is undisputed that the lands claimed by plaintiff as accretions occupy the exact situs of lands originally in place, which were surveyed and platted by the United States. A copy of a plat certified by the surveyor general in 1855 shows that, beginning at a point several miles north of Section 30, the east bank of the Missouri river ran in a slightly southwesterly direction to a point approximately coincident with its intersection of the center east and west line of Section 30 extended, and that from this point it ran in a southeasterly direction; that Sections 18 to 31, inclusive, border on the east bank of the river; that Section 18 lies directly north of Section 19, Section 19 lies directly north of Section 30, and Section 30 lies directly north of Section 31; that, beginning almost two miles north of Section 30, in what would be the Northwest quarter of Section 18, a slough, designated on the plat as "Keg Creek Slough", extended southeasterly from the east bank of the Missouri river through Section

18, and then in a southerly direction through the east half of Sections 19, 30 and 31 and again reached the Missouri river a short distance south of Section 31; that the west half of Sections 19 and 30 were not surveyed and platted in quarter sections, but the east half of the west half of each of these sections was platted in 80 acre tracts, and the land lying west of these 80 acre tracts was surveyed and platted in numbered lots; and that the lots in Section 30 were numbered from 1 to 4 inclusive, beginning at the north side of the Section, lots 1 and 2 being north of the east and west center section line, and lots 3 and 4 south thereof.

While the original plat indicates that lot 3 in Section 30 contained 68.82 acres, a survey made in 1891 shows only 32.50 acres of this land still lying east of the bank of the Missouri river, and indicates conclusively that the Missouri river had encroached upon this land during the intervening years. Plats introduced in evidence by both plaintiff and defendants, from surveys made a comparatively short time before the trial, indicate that the river also encroached to the eastward upon lands lying north of lot 3; because, while the plat of the original government survey showed the east bank of the river extending in a slightly southwesterly direction along these lands, the later plats show that, beginning at the north line of Section 30, the east bank of the river was much further east, and much nearer the west line of the east half of the northwest quarter of the section than it appears on the original plat. These later plats also show that, from the north line of Section 30, until it reached a point only a short distance north of the east and west center line thereof, the bank runs in an almost southerly direction, then turns quite sharply toward the westward and slightly southward, and, after running in this direction to a point which appears to be a few hundred feet west of what would be the west line of the northwest quarter of the southwest quarter of the section, again turns sharply toward the south, and then toward the southeast. Both of these plats also indicate the location of a slough designated as "Sandy Slough", which is the same as the slough called "Keg Creek Slough" on the original plat. While neither of these plats extends to the point where the slough intercepts the east bank of the Missouri river on the north, we think there is sufficient in the evidence to indicate that there had been no pronounced change from its original course until it reached a point about the middle of the southwest quarter of the northeast quarter

720

of Section 30, on the land now owned by plaintiff. At this point it appears that a new branch of the slough ran southwesterly from the original course, across the southeast corner of the south-west quarter of Section 30, and thence to the Missouri river. The public highway referred to in the description in plaintiff's deed appears on both plats, immediately east of the slough as it extends southward through the east half of Section 30.

It is undisputed that sometime, apparently between the years 1904 or 1905, and 1915 or 1916, the waters from the river began coming down Sandy Slough in increasing volume until the channel through the slough carried a very considerable amount of the total flowage of the Missouri river. It is also undisputed that in times of high water, not only the bed of the channel through the slough but the greater part of the land in Section 30, from the west bank of the slough westward to what is referred to as the towhead or island was covered with water. This towhead or island, comprising a tract of something more than twenty acres, lies mostly to the west of but includes a part of the west portion of the northwest quarter of the southwest quarter of Section 30, and was never completely covered with water. It appears from the evidence that the water from the Missouri river came into Sandy Slough north of Section 30, and that at times it came down in such volume that it spread out over the lands in Section 30 to the west of the slough. There is a conflict in the evidence, however, as to how much of the land west of the slough was covered with water, the appellant claiming that all of it except a small part of the towhead was submerged, while appellees contend that some parts of this land never entirely disappeared and that none was completely covered except in time of high water. The evidence is also in conflict as to when these waters began to flow down through the slough in such great quantities, and as to how long this condition continued. It is the contention of the appellant that a very considerable part of the total volume of water of the Missouri river came down over all the land in Section 30 between the west bank of the slough and the towhead; that the water flowed in this course and covered all of these land for several years; and that in flowing over these lands the water not only covered them but washed them away, so that they ceased to be lands in place. The appellees, on the other hand, contend that the encroachment of the river into Sandy Slough took place more than a mile

north of Section 30; that the channel followed by this water was down through the bed of Sandy Slough; that it was only during high water that these waters spread out over the land to the westward thereof; that none of these lands were washed away; that when the high waters receded these lands always reappeared; and that at no time did they cease to be lands in place.

It is impossible to review the evidence of each of the witnesses on both sides in detail, and we shall attempt to do no more than point out a few of the important phases of the evidence from which we reach our conclusion. There seems to be no question but that all of the lands here involved were low lands lying along the Missouri river; that, as already stated, all of these lands were surveyed by the government and passed through unbroken chains of title to the defendants now claiming to be the owners; and that until approxiamtely 1915 or 1916 some of these lands were cultivated, timber was taken from portions thereof, and, until that time, all of them were lands in place. It also seems to us quite clear from the evidence that it was only while the waters of the river were coming down through the slough in large quantities that any considerable part of the land in controversy was submerged, and that, if all of it except the towhead was ever completely submerged, this condition occurred and continued only during times of high water. It also appears to us that the period during which these lands were thus subjected to overflow corresponds very closely to the period extending from the time when the water began to come into the slough from the east bank of the Missouri river north of the lands in question and ending when this encroachment was stopped by certain river improvements referred to in the evidence as revetments or riprapping. The purpose of this work appears to have been to prevent the water of the river from flowing into the slough and to confine it to the west of its regular bank, and this purpose seems to have been effectively accomplished, because, when the work was completed, the lands in question ceased to be submerged.

█ Considering the evidence as a whole, we cannot escape the conclusion that, as the Missouri river continued its encroachment to the eastward north of Section 30, it finally reached a point where considerable volumes of water began flowing down through Sandy Slough; that in times when the water was at an ordinary stage the current that flowed through this channel was

confined within the bed of the slough, which the evidence indicates was approximately 150 feet wide. The plats show that the land along the west bank of the slough is only approximately one foot lower than the land at the extreme west adjoining the east side of the towhead, and that even the towhead, which the evidence indicates was never submerged, is very little higher than the land adjoining the west bank of the slough. We think the evidence indicates that in times of high water the channel of the slough could not carry the volume of water pouring into it to the north of Section 30; and that these flood waters then began flowing over the lowlands to the westward of the slough until most of them, and at times perhaps all of them, except the towhead, were submerged. While the evidence tends to show that, as the flood waters receded, small gullies or depressions may have been washed out at different places on these lands, we do not think the evidence is sufficient to sustain the appellant's contention that the land originally in place, which occupied the situs of the land to which he now makes claim, was washed away and ceased to be land in place. The mere fact that the land may have disappeared for a time, because of the volume of water that came down through the slough and spread out over it, would not be sufficient to destroy the defendants' ownership thereto as lands in place, under their respective chains of title. Payne v. Hall, 192 Iowa 780, 185 N. W. 912; Mulry v. Norton, 100 N. Y. 424, 3 N. E. 581, 53 Am. Rep. 206; St. Louis v. Rutz, 138 U. S. 226, 11 Sup. Ct. 337, 34 L. Ed. 941; Ocean City Assn. v. Shriver, 64 N. J. Law 550, 46 Atl. 690, 51 L. R. A. 425.

Moreover, even if the original lands in place had completely disappeared and ceased to be lands in place, we do not think the evidence is sufficient to show that the plaintiff has established his right to the lands now claimed by him as accretions to the lands in place acquired by him in the deed from Lorena Leeka. The evidence quite clearly establishes that the east bank of the slough adjoining the highway is several feet higher than the land on the west side of the slough, and that the channel of the slough flowed along the east bank. The plats indicate that there is a gradual, though very slight, rise in the land from the west bank of the slough toward the towhead at the west end of this land. While there is a slight depression around the east side of this towhead, we think the evidence clearly indicates that this depression was filled up and that the water ceased to

flow through it long before it ceased to flow through the channel of Sandy Slough. Even if it be conceded that the lands originally in place were washed away and that the lands now located where these original lands in place were formerly located are accretions, such accretions began at the west and extended eastward and were not accretions to the land in place and now owned by the plaintiff.

We think the evidence sufficiently supports the findings of the trial court, and the decree appealed from is accordingly affirmed.—Affirmed.

SAGER, C. J., and KINTZINGER, HAMILTON, STIGER, and MILLER, JJ., concur.