Holbert *v.* Edens.

A. HOLBERT AND WIFE *v.* WM. EDENS *et al.*

1. WATER-COURSES. *Low water mark. Contract for sale of land.* Under a contract for the sale of land at a stipulated price per acre, where the lines of the tract call for a tree on the south side of a river navigable in the common acceptation of the term, and for the river, thence with the river as it meanders, the vendee is only required to pay for the land bounded by a line running with the ordinary low water mark, and any islands between that line and the thread of the stream, and not for the land covered by the water.

2. CONTRACT TO SELL LAND. *Rights of vendor and vendee under title bond.* Where, under such a contract, the land is described as containing a given number of acres more or less, and the vendee makes a cash payment sufficient, at the price stipulated, to pay for about half that number of acres, and is to pay the remainder, if any, three years from the date of the contract, and the vendor is to make title when the purchase money is paid, the vendee is bound to ascertain and, if he wishes to stop interest, to tender the remainder of the purchase money at the time agreed upon, the contract containing no provision for the survey of the land. And interest is properly chargeable on the debt, although the title bond, in which the stipulation is contained, be only signed by the vendor, the vendee being in possession of the land from the date of the contract.

FROM HANCOCK.

Appeal from the Chancery Court at Sneedville. H. C. SMITH, Chancellor.

F. M. FULKERSON and A. S. PROSSER for complainants.

McDERMOTT & KYLE for defendants.

COOPER, J., delivered the opinion of the court.

Bill filed, among other things, to enforce a vendor's lien on land for the unpaid purchase money. The land lies in a bend of Powell's river. The chancellor rendered a decree enforcing the vendor's lien, but refused to charge the vendee with interest on the deferred payment of the purchase money, or to charge him with the price of the land covered by the river *ad filum aquæ*. The sale was made on the 23d of February, 1860, and the bill was filed on the 19th of February, 1876. The sale was by bond for title in these words:

"We, Pleasant Tankesley and John Boulton, bind ourselves to pay William Edens in the sum of eleven hundred dollars; the conditions of this obligation is such, that, whereas the said William Edens has this day purchased of us, for the consideration of seven dollars per acre, in the following payments, to-wit: the said Edens pays to the said Tankesley and Boulton three hundred dollars in hand, and the remainder, if any, to be paid three years from this date, a certain tract of land, in the State of Tennessee, Hancock county, district 14, containing eighty acres be the same more or less, known as the Tankesley land, on the south side of Powell's river, and bounded as follows, to-wit: Beginning at an elm and beech on the south side of Powell's river, then down the river as it meanders to Wm. Harrold's line, thence north-east direction with Harrold's line to the river, thence down the river as it meanders to the beginning, so as to

include all the land the said Tankesley and Boulton own in the bend of said river. Now, if we should make, or cause to be made to the said William Edens, his heirs or assigns, a good warrantee deed to the said tract of land on making of the last payment then this obligation to be void, otherwise to remain in full force and effect. The said Edens to have possession of said land at any time he wants it."

Edens went into possession of the land at the date of his purchase, and has remained in the uninterrupted possession thereof ever since. He paid the cash payment of $300, and has never paid the deferred payment. No survey of the land seems to have been made until after this bill was filed. It was then found that the quantity of land contained in the boundaries of the title bond, if the bank of the river was followed, amounted to seventy-eight acres; if the boundary line followed the *filum aquœ* of the river, the tract contained eighty-four acres. It was agreed by the parties that Powell's river is a small river, unsuited for the navigation of steamboats or sea vessels, and was never used for such purpose; but that the same is navigable for floating flatboats and rafts down stream during freshets and high water, though not during an ordinary stage of water. During the summer and fall months, the stream can rarely ever be used for flatboating or rafting, but during the winter and spring months there are frequent tides sufficient for such purposes, as is usual in the rivers of East Tennessee. The proof shows that there are four islands in the river that will be included in the

boundaries of the tract sold if the line extends to the middle of the stream.    One of these islands is large, the others small, and the river does not run around the largest island at all seasons of the year.    The small islands are not susceptible of cultivation, and have no timber on them.    There are some elms and sycamore trees on the largest island, but, says the only witness who speaks of these islands, " I would not fence the largest island and cultivate it for what I could make on it."

Upon the foregoing facts, the first point raised and argued is, whether the vendee is liable to pay on the land which would be included in the river boundary running with the centre of the stream, or only for the quantity obtained by drawing in the line to low water mark.    The point is one of first impression in this State, and upon which there is grave doubt.

If a water-course be navigable in a legal sense, the soil covered by the water, as well as the use of the stream, belongs to the public.    If it be navigable only in the ordinary sense, the ownership of the bed of the stream is in the *riparian* proprietors, and the public have an easement therein for purposes of transportation and commercial intercourse.    If the stream be so shallow as to be unfit for such purposes of transportation and commerce, both the right of property and use are in the owners of the adjoining land. A stream is navigable in a legal sense, when it is capable, in the ordinary stage of the water, of being navigated, both ascending and descending, by such vessels as are usually employed for purposes of com-

merce. A river not navigable in a legal sense, may yet be navigable in the common acceptation of the term, as where, in certain stages of the water, it may have sufficient depth for flatboats, rafts, or small vessels of light draft. *Elder* v. *Burrus*, 6 Hum., 358; *Stuart* v. *Clark*, 2 Swan, 10; *Sigler* v. *State*, 7 Baxt., 473. The agreed state of facts in this case shows that Powell's river is not navigable in a legal sense, but is navigable in the common acceptation of the term. The ownership of the bed of the stream is, therefore, in the *riparian* proprietors.

There is some uncertainty both in the language of the courts and of the text writers as to whether this ownership is a mere incident to the title to the banks of the stream, or depends upon sufficient language being used in the grant, under which the owner holds, to pass the title to the soil under the water. Sir Matthew Hale, in his famous tract *De Jure Maris et Brachiorum ejusdem*, from which all our common law learning on this subject is deduced, says: "Fresh rivers, of what kind soever, do, of common right, belong to the owners of the soil adjacent, so that the owners of the one side have a common right, the propriety of the soil, and consequently the right of fishing, *usque filum aquæ;* and the owners of the other side, the right of soil or ownership, and fishing unto the *filum aquæ* on their side. And if a man be the owner on both sides, in common presumption, he is owner of the whole river, and hath the right of fishing according to the extent of his land in length. With this agrees the common experience." Harg. Law

Tracts; 6 Cow., 537, note. The plain meaning of this language is that the ownership of the soil under the river attaches " of common right," that is by law, to the ownership of the adjacent banks. And so are the decisions. *Carter* v. *Marcot*, 4 Burr., 2164; 2 Mod., 510; Dav., 152; *Ex parte* Jennings, 6 Cow., 518. In this last case, the grant from the State bounded the land on the margin of the stream, yet it was held to extend, " by construction of law," to the centre of the stream.

In this view, the important matter · in a grant is to use such language as carries the banks of a stream, the ownership of the soil under the river following as an incident. Nevertheless, there are in the books some nice distinctions which seem to depend on the terms of the instrument of conveyance, where the ownership of the bed of the river is sometimes held to pass, and sometimes not to pass, although the banks of the river be conveyed. If the intention, to be gathered from the whole instrument, is to make the stream the boundary of the land conveyed, the line runs to the thread of the stream. If, on the other hand, " the bank, side, margin or shore " of the stream be used in such way as to show an intention to exclude the stream, it becomes a monument, and the soil under the water will not pass, even in cases where the boundary is carried to the line of low water mark. *Dunlap* v. *Stetson*, 4 Mason, 349; *Child* v. *Starr*, 4 Hill, 369; *Bradford* v. *Cressey*, 45 Me., 9; *Daniels* v. *Cheshire R. Co.*, 20 N. H., 85; *Halsey* v. *McCormick*, 3 Kernan, 296; *McCulloch* v. *Aten*, 2 Ohio, 425. The

14—VOL. 5.

general rule undoubtedly is that a call for the stream
or bank, or object on the bank, and then with the
stream according to its meanders, will carry the bound-
ary *ad filum aquæ*, whether the grant be by the State
or a private individual.   3 Wash. Real Prop., 353,
(3d ed.)   And our decisions are in accord.   *Massen-
gill* v. *Boyle*, 4 Hum., 205; *Martin* v. *Nance*, 2 Head,
649; *Elder* v. *Burrus*, 6 Hum., 358; *Stuart* v. *Clark*,
2 Swan, 10; *Branham* v. *Turnpike Co.*, 1 Lea, 706.

The actual call in these cases is for or with the
stream, not for or with the center of the stream.
The question has not been discussed whether the center
of the stream is reached "by construction of law,"
from the fact that the adjacent banks pass, or by
force of the call.   Nor has the point now before us,
the liability of the vendee to pay for the soil between
low water mark and the thread of the stream, been
considered and adjudged.   The point was raised in
*Elder* v. *Burrus*, 6 Hum., 358.   There the land,
bounded on the Cumberland river, was sold as con-
taining a given number of acres, the vendor agreeing
to refund the purchase money for any deficit in the
quantity at a fixed price per acre.   The vendee sued
upon the agreement, alleging a deficit.   The last call
of the grant was, "up the Cumberland river with its
meanders."   If the line followed ordinary low water
mark there was a deficit; if the center of the stream
there was no deficit.   The court held that Cumber-
land river being navigable in a legal sense, the line
ran with ordinary low water mark.   It seems, how-
ever, to have been taken for granted that if the line

had been the centre of the stream, the vendee would have had no right of action.

It is almost certain, however, that when a sale is made of land by the acre, at a fixed price per acre, bounded on a navigable stream in the ordinary acceptation of that term, the parties do not contemplate that the vendee is to pay for the land between ordinary low water mark and the centre of the stream, and actually covered by the water. The right of the public to an easement in the stream may well be held to take so much of the tract out of the estimate, unless the contract expressly call for the center of the stream. We think it a safe rule to adopt in all such cases that the vendee intends to convey to ordinary low water mark, and that the propriety of the soil under the water, "by construction of law," or, to use the words of Sir Matthew Hale, "of common right," *usque filum aquæ,* goes with the ownership of the adjacent banks. If there are islands in that part of the stream which would pass by operation of law, they ought to be estimated in ascertaining the quantity of land to be paid for. In this case the respective sizes of the islands do not appear, while the only witness examined speaks of them as of no value. They are probably mere sand bars of no great extent, and not worth the cost of a re-survey at the price fixed by the contract.

The defendant insists that he ought not to be required to pay interest on the purchase money the payment of which was deferred, because it was the duty of the vendor to have the land surveyed, and

the quantity ascertained before the amount which he was required to pay could be ascertained. The contract, however, expressly stipulates for the payment of the residue of the purchase money at a time fixed, "three years from this date," meaning the 23d February, 1860, when the title bond bears date. There is no provision for a survey by either party, and, therefore, the first act devolved upon the vendee, namely the payment, and he was bound, at his peril, to ascertain the amount before the day of payment. Whether he might not have stood upon the recital in the title bond that the tract contained "eighty acres," and made a good tender for the difference between that quantity and the land paid for by the cash payment, it is unnecessary to enquire, no tender having in fact been made. The uncertainty of the remainder of the purchase money, evidenced by the use of the words "if any," is like the uncertainty in the quantity of land, evidenced by the use of the words "more or less," and did not change the positive obligation which was to pay that remainder at a fixed date. And the time was ample to ascertain the truth.

It is also urged that the defendant ought not to be required to pay interest, because of the long delay in seeking to enforce the payment of the principal. Mere delay in pressing the collection of a just debt is not, however, any reason why the creditor should not have interest. The debtor may at any time stop interest by paying the debt. The defendant has been, his answer admits, in the possession, use and enjoyment of the land since the date of the contract. He

went into possession under a written contract by which the legal title to the land was reserved for the security of the unpaid purchase money.    He is thereby estopped to dispute the charge, or resist the enforcement of the lien.    *Jackson* v. *Rutlege,* 3 Lea, 632. The uniform rule in this State has been to allow interest on such a demand.    There is nothing in this case to take it out of the rule.

The chancellor's decree will be modified in accordance with this opinion, . and the defendant will pay the costs of this court.