POSEY, McCLURE *et al.* v. H. M. JAMES *et al.*

1. RIPARIAN RIGHTS. *Alluvial accretions.* Where alluvial accretions are made from the bank and extending into the river, the title vests in the riparian owner.

2. SAME. *Boundaries.* A person whose land is bounded by a stream of water which changes its course gradually by alluvial formations, shall still hold the same boundary, including the accumulated soil.

3. SAME. *Same.* Where a river is one of the boundaries of a tract, it is a legal deduction that there is no vacant land left for appropriation between the river and the river boundary of such tract.

4. SAME. *Same.* Where two of the boundary lines are as follows: "246 chains 6 links to a cottonwood marked W. & C. on the bank of a chute of the Mississippi river, thence down said river with its mean-

ders south," etc., and in front of this line a sand-bar formed, increasing to several hundred acres of tillable land; *Held,* that the boundary extended to low-water mark, and included this accretion.

### FROM SHELBY.

Appeal from the Chancery Court at Memphis. R. J. MORGAN, Ch.

L. W. FINLAY for complainants.

R. J. MORGAN and A. H. DOUGLASS for defendants.

TURNEY, J., delivered the opinion of the court.

In 1866 James purchased of J. F. Mills a tract of land on the Mississippi river, a few miles north of Memphis. Two of the boundary lines of the grants from the State, embracing the lands of James, are as follows: "Two hundred and forty-six chains fifty links to a cottonwood marked W. & C., on a chute of the Mississippi river, thence down said river with its meanders south," etc., the latter line being the western boundary.

In front of this line a sand-bar formed, and in a few years increased to two or three hundred acres of tillable land, and the part in front of James was in a good degree cleared and put in cultivation by him. It was claimed by him as accretions to his land.

On the 30th of January, 1874, McClure obtained a grant for this new land, and now files this bill, alleging title in himself and a trespass by James, enjoining James and his tenants from further operations, asking damages, etc. The defendant sets up title in

himself. The cause was heard alone upon the question of title. The chancellor dismissed the bill.

One of the questions is, Is the newly made land an island formation commencing in the river, away from the main land, or is it accretions to the land of James by deposits beginning upon his land and extending into the river? Another is, Is James confined to the call for the cottonwood tree described?

In *County of St. Clair* v. *Lovingston*, 23 Wallace, U. S. Reports, the court says: "In the light of the authorities, alluvion may be defined as an addition to riparian land, gradually and imperceptibly made by the water to which the land is contiguous. It is different from reliction and is the opposite of avulsion. The test as to what is gradual and imperceptible in the sense of the rule is, that though witnesses may see from time to time that progress has been made, they could not perceive it while the process was going on. Whether it is the effect of natural or artificial causes, makes no difference. The result as to the ownership in either case is the same. The riparian right to future alluvion is a vested right. It is an inherent and essential attribute of the original property. The title to the increment rests in the law of nature. It is the same with that of the owner of a tree to its fruit, and of the owner of flocks and herds to their natural increase. The right is a natural, not a civil one. The owner takes the chances of benefit and of injury arising from the situation of the property. If there be a gradual loss he must bear it, if a gradual gain it is his."

In *New Orleans* v. *United States*, 10 Peters, 662, the court said: "The question is well settled at common law that the person whose land is bounded by a stream of water which changes its course gradually by alluvial formations, shall still hold the same boundary, including the accumulated soil. No other rule can be applied on just principles. Every proprietor whose land is thus bounded, is subject to loss by the same means which may add to his territory, and as he is without remedy for his loss in this way, he cannot be held accountable for his gain."

In the case already cited from 23 Wallace, it is said: "Where a survey and patent show a river to be one of the boundaries of the tract, it is a legal deduction that there is no vacant land left for appropriation between the river and the river boundary of such tract." Citing 4 Monroe, 62; 1 B. Monroe, 26; 5 Dana, 100. "Where a deed calls for a corner standing on the bank of a creek, thence down said creek with the meanders thereof," the boundary is low-water mark. Where a deed calls for an object on the bank of a stream, "thence south, etc., and with the course of the bank to the place of beginning," the stream at low-water mark is the boundary.

The same case also holds: "Where premises are described as bounded by a monument standing on the bank of the river and a course is given as running from it down the river as it winds and turns to another monument, the grantee takes *usque filium aquæ*, unless the river be expressly excluded from the grant by the terms of the deed."

In *Railroad Co.* v. *Schurmier*, 7 Wallace, 284, Justice Clifford delivering the opinion of the court, says: "Appellants contend that the river is not a boundary in the official survey; that the tract as surveyed did not extend to the river, but that the survey stopped at the meander posts and the described trees on the bank of the river. Accordingly they insist that lot 1 did not extend to the river, but only to the points where the township and section lines intersected the left bank of the river, as shown by the meander posts. The facts appear that when the water in the river was at medium height there was a current in the channel between what is called the island and the bank where the meander posts were located, but when the water was low there was no current in that channel, and when the water was very high in the river the entire parcel of land designated as the island was completely inundated." Upon these facts, the court says: "Express decision of the supreme court of the State was, that the river, in this case, and not the meander line, is the west boundary of the lot, and in that conclusion of the State court we entirely concur." That case was in its facts very similar to the one before us.

*Martin* v. *Nance et al.*, 3 Head, 649, was an action of ejectment for land on the shore of Cumberland river. The plaintiff claimed by grant from the State in 1857. He insisted the land entered by him was vacant at the time. It embraced a bar or strip of land of twenty-two acres between the top of the bank and low-water mark. The defendant insisted the State

had parted with the land by grant to James Bosley, in 1787. The river line of that grant was, "thence north two hundred and seventy poles to a sycamore on the bank of Cumberland river, thence down said river according to its several courses one hundred and ninety-five poles to a large sweet-gum." The circuit judge charged: "These calls will carry the title to low-water mark, and thus cover the land entered by the plaintiff, although the trees called for were upon the bank eleven poles from low-water mark, unless it were shown that a line was run and marked upon the bank at the date of the grant. In other words, that the law will presume upon these calls that the true line was at low water mark, unless it were proved that it was actually run and claimed at a different place." This charge was approved and the judgment affirmed, the supreme court saying: "The case of *Elder* v. *Burrus,* 6 Hum., 364, following the North Carolina case of *Wilson* v. *Forbes,* 2 Dev., 364, settles the law of this State that the owners of land upon navigable streams have title to ordinary low-water mark, but if not navigable, to the center. So in this case, the title of Bosley and those claiming under him would extend to the river at the ordinary low-water mark, and run with that from the sycamore to the gum, *and consequently leaves no vacant land.* It would be otherwise, as the court charged, *if it were proved* that a line had been run and marked from the one corner to the other on the bank at the time of the grant." In this case there is nothing that tends in the least to show a line from the cotton-wood had been run or

marked or claimed as the line of the grant, or at any other time.

In 23 Wallace case, already cited, the court says: "It may be considered a canon in American Jurisprudence that where the calls in a conveyance of land are for two corners at, in, or on a stream or its banks, and there is an intermediate line extending from one such corner to the other, the stream is the boundary, unless there is something which excludes the operation of this rule by showing that the intention of the parties was otherwise."

In *Branham et al.* v. *Bledsoe Creek Turnpike Co.*, this court (Judge Cooper delivering the opinion) held: "In the conveyance of land on a creek, a call for one-half the creek, or for a line down the centre of the creek with its meanders, carries title to the middle of the main branch, if the stream is divided by an island into two unequal branches."

There is some conflict in the testimony in the case at the bar as to whether the formation by alluvion commenced on James' land, or began as an island formation in the river. The decided preponderance is in favor of the formation on and from the bank. The fact that in times of high water a slough runs through the new-made land near the bank, does not weaken the proof that the accretions began at the bank. River men, who have had an experience of many years and whose duty it was to observe such things, fix the beginning on the bank, and explain the depression through which water passes at high water, by the statement that the superior height out in the river

over the height at or near the bank may be, and often is, caused by the current coming in contact with eddy water and thereby floating more of the alluvion further out, or by winds operating upon the water carrying the alluvion. The proof shows satisfactorily that the formation sometimes called a "backbone," commenced at the bank and gradually grew, extending into the river in the direction of the island known as "The Old Hen," and that its growth and depression depended upon the causes mentioned.

In the Railroad and Schurmier case reported in 7 Wallace, the slough was more extensive and the water ordinarily deeper than here, yet the court awarded the land to the riparian owner.

Upon the authority of the principles in the cases quoted, and which we adopt, we think the decree of the chancellor correct.

Affirmed.