# CUNNINGHAM v. PREVOW et al.—192 S. W. (2d) 338.

Western Section. July 23, 1945.

Petition for Certiorari denied by Supreme Court, January 11, 1946.

644

J. L. Fry, of Union City, for complainant.

Burnett & Donaldson, of Tiptonville, and W. R. Landrum, of Trenton, for defendants.

ANDERSON, P. J. This is an ejectment suit. The subject matter is a tract of land lying in Lake County on the east bank of the Mississippi River, which was formed by the process of accretion. The chancellor held for the complainant and the defendants appealed. The latter contend that the locus in quo was formed by accretion to riparian land owned by them and their predecessors in title, and hence belongs to them under the law of accretions. The complainant contends that the land reformed in an area formerly occupied by land owned by her predecessors in title which in part disappeared as a result of erosion over a period of many years; that she is the holder of the legal title to the entire tract as it originally stood, and as such entitled to the land which reformed within the bounds of her muniments of title even though the new formation was the result of accretion to the shore of land owned by the defendants and their predecessors in title.

The basis of the complainant's claim is the asserted proposition that land formed by the process of accretion in the place of land lost by the process of erosion is regained to him who owns the title to the land that was washed away. Upon the other hand, the defendants contend that if it be assumed that the complainant and her predecessors in title owned the land as it originally stood, the title was destroyed to so much of it as was lost by erosion; that since the land in controversy re-formed as an accretion to their shore, it belongs to them under

the law of accretion. The basis of their contention is the asserted proposition that the title to riparian land is lost by the gradual and imperceptible process of erosion and that if by this process land originally nonriparian is made riparian, the owner is entitled to alluvion even though it extend across a fixed division line which was submerged as a result of the erosion and occupy an area formerly occupied by the land of another which was washed away.

These, broadly speaking, are the contentions of the respective parties and present the determinative question in the case. It has been briefed and argued with ability and has proven to be most interesting.

In connection with their presentation, counsel for the defendants thoughtfully submitted a map prepared from the exhibits and testimony, the accuracy of which is not questioned in so far as is concerned the purpose for which it was intended. We reproduce it on a reduced scale by way of facilitating the necessary statement of facts. As reduced, the map appears in the following form:

Complainant is one of several children of J. J. C. Bondurant, deceased, under whom she claims. On August 4, 1902, Mr. Bondurant acquired title to a 130-acre tract of land lying on the east bank of the Mississippi River which then, or just prior thereto, lay in the area enclosed in the lines ABCD on the map. At that time the defendants' predecessors in title owned the land immediately adjacent thereto on the east, which is represented on the map as being bounded by the lines ABEF and designated "Prevow tract (Jones-Boshears) 101 acres". As is apparent, the Mississippi River was then the western boundary of the former tract and the latter was at that time nonriparian. About 1898 the slow and imperceptible process of erosion began, resulting in a gradual change eastward in the channel of the river. This continued until about 1917. The result was that when the maximum change had been accomplished, the bed of the river was approximately at the point indicated on the map by the line running from J to H and the extensions thereof designated "High Bank" and "Old Shore Line". As a consequence, all of the 130-acre tract owned by the complainant's predecessors in title was washed away except a triangular remnant of about 7 acres lying in the southeast corner in the area represented on the map as being bounded by the lines AJG. The northwest corner of the tract now owned by the defendants and indicated on the map by the lines GBH was also washed away in the process. The area which thus disappeared is shown on the map by the portions shaded in blue, pink and yellow, and designated respectively "Prevow Ac", "Accretions in litigation", and "Cunningham accretions".

Some 1,100 acres of land in Kentucky lying immediately north and northeast of that here involved were also washed away.

In 1917 or thereupon, the mighty stream again decided upon a change in its channel, this time in the opposite direction toward the Missouri shore. In 1925 or thereabout deposits of soil began to appear above the state line in Kentucky adjacent to the eastern shore line, gradually spreading outward from the bank and southwesterly. This accretive process continued until 1940 when the channel of the river was established at the line designated on the map as "Shore Line 1940". The result of this process of accretion was the appearance of new land substantially in the shape and location of that which had been lost by the gradual and imperceptible process of erosion. In other words, the 130-acre tract owned by the complainant's predecessors in title was re-established substantially as it was before the erosive process began in 1898, as was the corner of defendants' land that had been washed away.

Incidentally it appears that the erosive process has begun again so that the channel of the river has now moved eastward again to. the point designated on the map as "Shore Line 1942". But this is beside any question involved in the present litigation.

As indicated on the map, the area in controversy is that shaded in pink and enclosed in the lines GICB. The defendants claim this area under the law of accretion by reason of its being a mere extension of the accretions to their land represented by the area on the map shaded in blue and enclosed in the lines GBH. They make no claim to the area shaded in yellow and enclosed in the lines ABID, conceding that this area represents accretions to the 7-acre triangular remnant bounded by the lines AJG, being that part of the original 130-acre tract owned by the complainant's predecessors in title which was not washed away.

The sole contention of the complainant in this court is, as already indicated, that the loss of a large portion of the original 130-acre tract by the process of erosion did not affect the legal title to the whole and that when restored it was regained to her as the owner of that title irrespective of whether the re-formed land was an accretion to the land of the defendants.

The issue involves a vital distinction between the effect upon title to land of an avulsion and its consequences, and of erosion. Upon the question presented by the facts of this particular case, the authorities are in conflict and somewhat confused. As has been said, the conflict seems to be due in large part to the confusion of the common law rule as to the title to submerged land on its reappearance, with the rule as to the right of a riparian owner to accretions. Note 8 A. L. R. 640, 644. In the generalizations to be found in some of the cases, it seems to us, the courts have failed to keep alive the distinction between the rule applicable to the consequences of avulsion and that applicable to erosion. The important and determinative character of this distinction requires an examination of the authorities.

■■ The law in cases of alluvion is of ancient origin and well settled. As far back as the Institutes of Justinian, it was laid down that "the alluvial soil added by the river to your land becomes yours by the law of nations. Alluvion is an imperceptible increase and that is added by alluvion whch is added so gradually that no one can say how much is added at any one moment of time."

The Code Napoleon and the English common law as laid down by Blackstone and recognized in this country are to the same effect. St. Clair Co. v. Lovingston, 23 Wallace 46, 23 L. Ed. 59, 63.

■ The term "alluvion" is applied to the deposit itself, while "accretion" denotes the act. However, the terms are frequently used synonymously. Katz v. Patterson, 135 Or. 449, 256 P. 54, 55; St. Louis I. M. & S. R. Co. v. Ramsey, 53 Ark. 314, 13 S. W. 931, 8 L. R. A. 559, 22 Am. St. Rep. 195. This right to alluvion is said to be "an inherent and essential attribute of the original property The title to the increment rests in the law of nature. It is the same as that of an owner of a tree to its fruits, and with the owner of flocks and herds to their natural increase. The right is a natural, not a civil one. The maxim 'qui sentit onus debet sentire commodum' lies at its foundation. The owner takes the chances of injury and of benefit arising from the situation of the property. If there be a gradual loss, he must bear it; if a gradual gain, it is his." St. Clair v. Lovingston, supra [23 Wallace 68, 23 L. Ed. 59].

■ In this state it has long been established that grants of land lying upon navigable streams extend to . the ordinary low water mark only, and that the title to the bed of such streams remains in the state. Martin v. Nance, 40 Tenn. 649; Posey v. James, 75 Tenn. 98; Goodwin v. Thompson, 83 Tenn. 209, 54 Am. Rep. 410; Holbert v. Edens, 73 Tenn. 204, 40 Am. Rep. 26.

■ If a water course be navigable in the legal sense, the soil covered by the water, as well as the use of the stream, not only belongs to the public but is not subject to entry or grant as other land. Ibid.

The vagaries of the Mississippi. River in their effect upon the boundaries of states, and private owners, as well, have been dealt with in several memorable opinions by the Supreme Court of this state, and the Supreme Court of the United States, but the precise question to which the particular facts of the present case give rise has

not been decided by our courts so far as we have been able to discover. It has been considered, however, by a number of courts in states in the Mississippi River Valley and Missouri River Valley, and the result of those decisions has been to build up a body of law which has been applied with substantial uniformity.

In the notable case of State v. Muncie Pulp Co., 119 Tenn. 47, 103, 104 S. W. 437, 451, after holding it to be settled that the soil under the Mississippi River to the western boundary of the state belongs to the state, and that whenever it is abandoned and no longer suitable or required for purposes of commerce and navigation, when not done imperceptibly and in process of accretion, may be taken in possession and disposed of by the state as her authorities may see fit, the court pointed out the difference in the effect of changes arising by the process of erosion and accretion and those occurring as the result of an avulsion. In this regard it was said:

"The channels of the rivers and other streams and bodies of water may and do become changed and their physical location altered by the forces of nature operating upon their shores or banks. When the change is made insensibly, by gradual and imperceptible washing away of one shore and the formation in like manner upon the other shore, it is said to be 'by erosion and accretion'. When it is made suddenly and violently and is visible and the effect certain, it is called 'avulsion'. Where the boundary lines between individuals, as well as states and nations, are marked by streams, and the location of the stream is altered by erosion and accretion, it continues to be the boundary line; but, where the alteration occurs as the result of an avulsion, no change is made, but the limits of the private estates or natural territory and jurisdiction remain as before. These principles are well

settled at common law, and have been frequently applied by the courts of the various states and those of the United States.''

In the same opinion, the court quoted with approval from Mayor, Alderman and Inhabitants of New Orleans v. United States, 10 Pet., U. S., 662, 717, 9 L. Ed. 573, as follows:

''The question is well settled at common law that the person whose land is bounded by a stream of water which changes its course gradually by alluvial formations shall still hold by the same boundary, including the accumulated soil. No other rule can be applied on just principles. Every proprietor whose land is thus bounded is subject to loss by the same means which may add to his territory; and, as he is without remedy for his loss in this way, he cannot be held accountable for his gain.'' ·

█ The underlying necessity for the rule that boundary lines upon navigable streams may be changed by erosion and accretion and proprietors separated by the stream may lose or gain land, is that the loss or gain is so gradual and imperceptible that it is impossible to identify and follow the soil lost or to prove where that gained came from. In such cases the loss must be suffered because it is impossible for the losing party to follow and identify his property. State v. Muncie Pulp Co., supra; and State of Nebraska v. State of Iowa, 143 U. S. 359, 360, 12 S. Ct. 396, 36 L. Ed. 186.

We have said enough to demonstrate that in its effect upon the boundaries of riparian owners, a change resulting from an avulsion is quite different from a change resulting from processes of erosion and accretion. The great cases of State v. Muncie Pulp Co., 119 Tenn. 47, 104 S. W. 437, and Stockley v. Cissna, 119 Tenn. 135, 104 S. W. 792, and Stockley v. Cissna, 6 Cir., 119 F. 812, re-

lied upon by the complainant, all involved changes effected by avulsion and the consequences thereof in their relation to rights of riparian owners. They are the celebrated Centennial Cut-off cases resulting from the fact and within about 30 hours on March 7, 1876, the Mississippi River suddenly and with great violence, made for itself a new channel, sweeping away about 2,000 acres of valuable land and placing nearly an entire civil district of Tipton County on the west side of the river, whereas theretofore it had been on the east side. The holding in each of these cases was that "this sudden change in the channel of the river could not affect the title of land thus transferred from one side of the river to the other; nor did it alter the boundary between the states."

That the result is different where the change is by the process of erosion and accretion is clearly indicated, indeed is emphasized in all three of these cases as well as in numerous decisions of the Supreme Court of the United States.

In Stockley v. Cissna, 119 Tenn. 135, 104 S. W. 792, 800, the locus in quo claimed by the complainant appeared following the slow recession of the waters brought about by an avulsion. Responding to the contention of the complainant that the law of accretions was applicable, the court adopted the position taken in the brief of counsel for the defendants as being an admirable statement of a sound reason why accretions cannot be claimed by a riparian proprietor as the result of an avulsion. The view thus adopted is as follows:

"We believe that, as an avulsion does not change property lines or property rights, the effort of an avulsion does not, and it must be true that the recession of the waters from the old channel was the immediate and direct result of the cut-off or avulsion. We do not

think there can be an avulsion which directly results in the abandoned channel of the river becoming gradually dry land, and that accretions could be made to the riparian owner's soil on the said abandoned channel. If an avulsion leaves property and boundary lines undisturbed, then the property and boundary lines remain exactly at the point at which they were when the avulsion took place. In Tennessee the riparian owner at the time of the avulsion had no title beyond low-water mark, and if the avulsion left that as the line we do not see how as a result of the avulsion the line can be projected further into the abandoned channel, however slow the waters may have receded therefrom."

In his great opinion in State v. Muncie Pulp Co., supra, Mr. Justice Shields elaborately discusses the same proposition. Indeed, that opinion and its companion, the case of Stockley v. Cissna, which immediately follows it in the reports, leaves nothing to be said as to the effect of an avulsion upon property lines and the title to land.

The distinction between that phenomenon and erosion and accretion is concisely pointed out in the early case of Posey v. James, supra, by a quotation from County of St. Clair v. Lovingston, supra, which is as follows:

"In the light of the authorities, alluvion may be defined as an addition to riparian land, gradually and imperceptibly made by the water to which the land is contiguous. It is different from reliction and is the opposite of avulsion."

There is, of course, no contention in the present case that the changes in question were brought about by avulsion and reliction. The record indisputably presents a case of lands lost by erosion and new land formed by the process of accretion. It is obvious therefore that the

doctrine applied in the avulsion cases above discussed can have no application to the facts in this case.

This brings us to the principle which we think is applicable to the situation presented by the facts of the present controversy. A well reasoned case on the subject, and a leading one is that of Welles v. Bailey, 55 Conn. 992, 10 A. 565, 566, 3 Am. St. Rep. 48, in which the court began by saying that there was involved the application in circumstances somewhat peculiar of the principle of accretion and reliction growing out of the changes in the bed of the Connecticut River. Referring to the defendants' contention in that case, and disposing of it, the court said:

"They say, in the first place, that the law of accretion applies only to the case of riparian land, and that as the plaintiff's lot did not originally bound upon the river, but was conveyed to him by distinct lines and boundaries, (at least upon the sides affected by the present question,) it cannot become by any changes of the river riparian land.

"We cannot accede to this claim. If a particular tract was entirely cut off from a river by an intervening tract, and that intervening tract should be gradually washed away, until the remoter tract was reached by the river, the latter tract would become riparian as much as if it had been originally such. This follows necessarily from the ordinary application of the principle. All original lines submerged by the river have ceased to exist; the river is itself a natural boundary, and every changing condition of the river in relation to adjoining lands is treated as a natural relation, and is not affected in any manner by the relations of the river and the land at any former period. If after washing away the intervening lot, it should encroach upon the remoter lot, and should

then begin to change its movement in the other direction, gradually restoring what it had taken from the remoter lot, and finally all that it had taken from the intervening lot, the whole, by the law of accretion, would belong to the remoter but now proximate lot. Having become riparian, it has all riparian rights. This general principle is recognized by all the textwriters and by numerous decisions of the English and American courts. The river boundary is treated in all cases as a natural boundary; and the rights of the parties as changing with the change of the bed."

Concluding, the court said:

"It necessarily follows from this reasoning that the land of the plaintiff took by accretion all that lay between its river front on the west side of the river and the receding bed of the river, and within lines drawn from the termini of its side lines at right angles to the channel of the river; and within this line falls the land in dispute."

The principle announced by this case with respect to the right to follow accretions across a division line previously submerged by action of a navigable stream is adopted and applied with substantial uniformity by the courts of the states lying in the Mississippi and Missouri River valleys. Bush v. Alexander, 134 Ark. 307, 203 S. W. 1028; Peuker v. Canter, 62 Kan. 363, 63 P. 617; Wood v. McAlpine, 85 Kan. 657, 118 P. 1060, affirmed on rehearing in 86 Kan. 804, 121 P. 916; Buse v. Russell, 86 Mo. 209; Naylor v. Cox, 114 Mo. 232, 21 S. W. 589; Rees v. McDaniel, 115 Mo. 145, 21 S. W. 913; Widdecombe v. Chiles, 173 Mo. 195, 7 3S. W. 444, 61 L. R. A. 309, 96 Am. St. Rep. 507; see also Cox v. Arnold, 129 Mo. 337, 31 S. W. 592, 50 Am. St. Rep. 450, and Frank v. Goddin, 193 Mo. 390, 91 S. W. 1057, 112 Am. St. Rep. 493; Yearsley

v. Gipple, 104 Neb. 88, 175 N. W. 641, 8 A. L. R. 636; Payne v. Hall, 192 Iowa 780, 185 N. W. 912; Doebbeling v. Hall, 310 Mo. 204, 274 S. W. 1049, 41 A, L. R. 382.

These cases as well as some others are collected in the notes appearing in 8 A. L. R. 636, and 41 A. L. R. 395.

The general rule deducible from these decisions, as stated by the annotator, is that where land bordering on a stream is washed away and an accretion to the land of another subsequently extends over the same place, the naturally formed land belongs to the owner of the land to which it is an accretion and not to the one originally owning the land in that place.

In one of the cases just cited, Doebbeling v. Hall, 310 Mo. 204, 274 S. W. 1049, 1053, 41 A. L. R. 382, a distinction is made between a case where riparian land is entirely washed away and one where only a part of it disappears, as is true in the present case. It was there held that where only a small portion of a tract of a riparian owner remained unsubmerged and accretion began to form to this and other adjoining riparian lands, the owner of the tract was not entitled to all of the accretions which formed within his original boundary but that there should be an apportionment of accretions according to a rule there adopted.

The basis of these decisions is that all original lines of land on a navigable stream which disappear by the gradual and imperceptible process of erosion cease to exist and "thereafter the relationship of all riparian lands and the river must be determined from the then conditions (both as to the actual then riparian lands and the river frontage) and not from previous conditions or previous relationship of the riparian lands and the river." Doebbeling v. Hall, supra.

■ The controlling principle is that although a particular tract of land may not be riparian or have riparian rights when acquired by the owner, yet if afterward the land intervening between it and a navigable stream is washed away by the gradual and imperceptible process of erosion so that the remoter tract thus becomes riparian and later, accretions are added thereto, such accretions belong to the owner of the remoter tract. And this is held to be true although the accretions may extend over the former division line and into the area occupied by the original riparian tract. See Doebbeling v. Hall, supra.

To the same effect is the concise statement in Gould on Waters, 3d Ed. 308, sec. 155, that when a fresh river changes its course and its center, even a lot not originally riparian may become so by such change and acquire the riparian right to accretions. Welles v. Bailey, supra, is cited by the author as authority for this statement of the rule.

In England, also, it seems to be held that the rule that land formed by gradual and imperceptible accretion due to natural causes belongs to the owner of the land adjoining the shore, applies even though the former boundary of such land prior to the accretion was well known and is readily ascertainable. Brighton, etc., Co. v. Hove Bungalows, 1 C. H. 372, 13 Brit. Ruling Cases 183.

In Yearsley v. Gipple, 104 Neb. 678, 175 N. W. 641, 8 A. L. R. 636, involving title to certain lands bordering on the Missouri River, the facts giving rise to the controversy are parallel to those in the present case and the contentions of the respective parties substantially the same. The plaintiff's lands, formerly non-riparian, became riparian by reason of a change due to erosion. He claimed that as a result he was entitled to all accretions

thereafter formed against his land without regard to his original boundary line. Upon the other hand, the defendant contended that where a conveyance of land is made by definite boundaries accretions extending beyond such boundaries do not pass by the deed; that the riparian owner may claim to the original boundary line only; and that the original owner of the soil so washed away and gradually replaced may again assert title.

In response to the question there posed, the court said:

"A critical examination of the cited decisions by defendant shows that a number of general expressions are used, which if considered without reference to the facts in each case might mislead. They are mostly cases in which the several courts considered that the stream had changed its course by avulsion. The principles applying to avulsion do not apply where the original soil was gradually disintegrated and washed away, the river taking its place, and as it receded leaving accretions. When, by gradual erosion, the river became the boundary of plaintiff's land, he then became a riparian owner, and was entitled to all accretions."

The court then proceeds to demonstrate that the courts of both England and Ireland have declined to sustain the contention of the defendant in that case to the effect that where there are known boundaries of land which have been submerged the foregoing principle does not apply.

The case which seems to have given rise in large part to the apparent confusion and conflict in authorities is that of Ocean City Ass'n v. Shriver, 64 N. J. L. 550, 46 A. 690, 51 L. R. A. 425. Generalizations to be found in the case of Mulry v. Norton, 100 N. Y. 424, 3 N. E. 581, 53 Am. Rep. 206, have apparently had the same effect.

In the Shriver case the right to follow accretions across a fixed division line previously submerged by the water was denied by a divided court. The ruling there made is elucidated and the case distinguished in the later case of Dewey Land Co. v. Stevens, 83 N. J. Eq. 314, 90 A. 1040, 1041, concurring opinion 83 N. J. Eq. 656, 91 A. 934, where the contest was between the grantee of a riparian grant from the state and one who claimed under a deed from the former owner of the submerged land after it had been restored. It was held that as the land was bounded by the ocean and not by a fixed line as in the Shriver case, the grantor lost the title to his land by its submergence and that his grant after the restoration conveyed no interest. Supporting their position, the complainants in that case relied upon what was said in the Shriver case. In holding the latter not controlling, the court pointed out that that case turned upon the proposition that the lot against which the locus in quo accreted was not bounded by the ocean in the conveyances under which the defendant claimed title.

There was, however, apparently no retreat from the position taken in the former case with respect to the determinative proposition in the present case, namely, the right to follow accretions across a division line pre-. viously submerged by action of the water.

In Yearsley v. Gipple, 104 Neb. 88, 175 N. W. 641, 8 A. L. R. 636, supra, the court maintains that the Shriver case is based upon a misconception as to the rule laid down in De Juris Maris, a work ascribed to Lord Hale, in that the text quoted to support the decision is taken from that part of the treatise relating to sudden changes by avulsion or by submergence.

Further evidence that the rule quoted in the Shriver case from De Jure Maris is that applicable to cases of

avulsion, is found in the fact that in his elaborate opinion in Stockley v. Cissna, 6 Cir., 119 F. 812, Judge Lurton makes precisely the same quotation from that work that the New Jersey court did in support of its conclusion. As already indicated, the learned opinion in the Stockley case makes it clear that the restoration of the land there involved was the direct consequence of an avulsion followed by reliction.

In State of Arkansas v. State of Tennessee, 246 U. S. 158, 168, 38 S. Ct. 301, 305, 62 L. Ed. 638, L. R. A. 1918D, 258, involving a controversy as to the boundary between the two states where there was again under consideration the effect of the sudden and violent change in the channel of the Mississippi River that occurred in 1876, Tennessee contended that since the avulsion caused the old river bed to dry up, what was called "the doctrine of the submergence and reappearance" must be applied so as to establish the ancient boundary as it existed at the time of the earliest record which is in 1823 with the effect of eliminating any shifting of the river bed that resulted from erosion and accretion of the half century preceding the avulsion.

This contention was rested chiefly upon the text from .De Juris Maris above referred to as having been in large part the basis of the decision in the Shriver case. Referring to this quotation, the court said that it was a statement of one of several exceptions to the general rule that any increase of land per relictionem or sudden recission of the sea belonged of common right to the King as a part of his prerogative and amounted to no more than saying that where the reliction did but restore that which before had been private property and had been lost through the violence of the sea, the private rights should be restored if the land is capable of identification.

"Such a case", said the court, "was Mulry. v. Norton, 100 N. Y. 424, 3 N. E. 581, 53 Am. Rep. 206, the true scope of which decision was pointed out in In re City of Buffalo, 206 N. Y. 319, 326, 327, 99 N. E. 850."

"Certainly", continued the court, "it (the text from De Juris Maris) cannot be regarded as having the effect of carving out an exception to the rule that where the course of the stream changes through the operation of the natural and gradual processes of erosion and accretion, the boundary follows the stream; while if the stream leaves its former bed and establishes a new one as the result of an avulsion, the boundary remains in the middle of the former channel."

As further indicating a divergence of opinion, the doctrine laid down in Welles v. Bailey, supra, was held in the Shriver case by a divided court to be unsound. Upon the other hand, as already pointed out, the courts of the Mississippi and Missouri River Valleys particularly have preferred the views of the Connecticut court in Welles v. Bailey to those of the New Jersey court in the Shriver case.

As said above, the other case containing general expressions which are apparently out of line with the weight of authority upon the precise question before us is the New York case of Mulry v. Norton, supra, which, incidentally, is also cited by the New Jersey court in support of its ruling in the Shriver case.

In the Mulry case the contest was between adjoining upland owners over the title to beach lands. The plaintiff Mulry claimed under a chain of conveyances which by a definite description embraced the locus in quo. The defendants through their grantor claimed to have acquired the land in dispute by alluvion or accretion. The changes in the disputed area, all of which were within

the boundaries of the plaintiff's title, were brought about by the "sudden and violent operation of the tides" which caused the removal of "larger and perceptible sections of beach" [100 N. Y. 424, 3 N. E. 584] from one place to another, during all of which the plaintiff was the undisputed owner of the adjacent uplands. In these circumstances it was held the plaintiff did not lose his title to the lands which had been temporarily affected by the sudden and violent action of the sea.

In limiting this decision to its true scope, the same court in the subsequent case of In re City of Buffalo, 206 N. Y. 319, 99 N. E. 850, 852, said: "In that opinion there are quite a number of quotations from learned text-writers and many original observations of a general character relating to littoral and riparian rights, loss of lands by avulsion or erosion, and acquests of land by recession of waters, alluvion, or accretion, which were doubtless used to illustrate the rule applicable to the specific facts of that case." "This", said the court, "becomes evident when we consider the breadth of the discussion and the limited scope of the decision."

After stating the facts as above set out, the court continued:

"It was with reference to these facts that Chief Judge Ruger wrote: 'It is not, however, every disappearance of land by erosion or submergence that destroys the title of the true owner, or enables another to acquire it, for the erosion must be accompanied by a transportation of the land beyond the owner's boundary to effect that result, or the submergence followed by such a lapse of time as will preclude the identity of the property from being established upon its reliction. Land lost by submergence may be regained by reliction, and its disappearance by erosion may be returned by accretion, upon

which the ownership temporarily lost will be regained. . . . It is equally true, however, that when the water disappears from the land, either by its gradual retirement therefrom or the elevation of the land by avulsion or accretion, or even the exclusion of the water by artificial means, its proprietorship returns to the original riparian owners.' [Mulry v. Norton] 100 N. Y. [424], 434, 3 N. E. [581], 585, 53 Am. Rep. 206. In the case at bar, as we have seen, the lands of the appellants Bowen et al. have been completely submerged by imperceptible erosion, and in this controlling circumstance we find the radical difference between the two cases. In the Mulry case the land which had been temporarily lost by the violent and perceptible impact of the elements was reformed within the boundaries of the plaintiff's title.''

Just before making this distinction and limiting the previous decision, the court had held that where land bordering on a body of water is lost by ''erosion'' which is the gradual and imperceptible wearing away of the land by the natural action of the elements, the state succeeds to the ownership thereof; where the land is added by ''accretion'' which is such a slow and gradual deposit of articles that its progress cannot be measured though its results may be discerned from time to time, the new land formed belongs to the owner of the upland to which it attached; but where lost by ''avulsion'', which is the sudden or violent action of the elements, the effect and extent of which is perceptible while it is in progress, the boundaries do not change.

In support of this conclusion the court expressly cited Welles v. Bailey, 55 Conn. 292, 10 A. 565, 3 Am. St. Rep. 48, which we have hereinabove referred to as a leading case on the subject.

It is apparent that by its decision in In re City of Buffalo, supra, the New York court aligned itself with the Connecticut court and with those of the Mississippi and Missouri River Valleys with respect to the effect of loss of land by erosion and its restoration by accretion where these processes are wholly unconnected with an avulsion.

Further evidence that the above quoted generalization found in Mulry v. Norton, supra, is applicable in cases involving changes caused by avulsion rather than by erosion is to be found in the fact that in his memorable opinion in State v. Muncie Pulp Co., supra, Mr. Justice Shields quotes it in his elaborate discussion as being applicable to the emergence of land by the process of reliction brought about by an avulsion. That he did not mean to imply that the quoted doctrine applied to a case where land was lost by erosion and new land reformed in the same area by accretion is to our minds demonstrated by the fact that immediately preceding the quotation from the Mulry case the following appears:

"The doctrine of accretions has no application to the filling up of the old channel, abandoned by the river for a new one, as the result of an avulsion. The rights of the parties, in every respect, remain as they existed prior to the change."

And again, 147 Tenn. at page 126, 104 S. W. at page 457: "The filling up of the old channel in this case was independent of the riparian rights and worked no change in them."

The same quotation from Mulry v. Norton is made by Mr. Justice McAlister in his outstanding opinion in Stockley v. Cissna, supra. But, as already indicated, he was dealing with precisely the same state of facts that were under consideration by the court in State v. Muncie Pulp Company, which showed a typical case of avulsion.

Moreover, as already said, Mr. Justice McAlister was careful to point out again and again that the facts of the case called for the application of the doctrine of avulsion and not the doctrine of erosion followed by an accretion. Thus, 119 Tenn. at page 166, 104 S. W. at page 800, he said: "This land must be, therefore, either accretion or the result of an avulsion. There is no intermediate course." And 119 Tenn. at page 165, 104 S. W. at page 800: "We have already held that the locus in quo of the present controversy and the rights of the litigants must be determined by the law applicable to a technical avulsion, and not to the rule governing accretions."

So it is, we say, that in both of these great cases the court construed the generalization found in Mulry v. Norton as applying to the emergence of land through reliction following an avulsion, just as did the court rendering the decision in the subsequent case of In re City of Buffalo, supra.

The chief reliance of the complainant in the present suit is the opinion of Mr. Justice Bachman, speaking for the court, in Keel v. Sutton, 142 Tenn. 341, 219 S. W. 351, 353. There are expressions in that case, when considered apart from the facts which tend to support the complainant's contention. These have caused us some concern in reaching our conclusion. We have decided, however, that that case is distinguishable upon its facts from the present one. There, the complainants owned a tract of land bordering on the Mississippi River. It became necessary for them to move on account of a change in the course of the river, which caused the banks to cave in, leaving only a narrow strip of some 5 or 6 acres. The erosion continued for a number of years. Some years thereafter accretions began to form on the cite formerly occupied by the complainants, and finally rose above the

water, so that some 20 or 25 acres became again susceptible of cultivation. The action was one in ejectment in which, of course, the complainants were required to establish their own title as against the defendant who had occupied the land under a tax title, having purchased it at a tax sale. It was contended by the defendant that because no paper writings were introduced to show title, the complainants could not succeed. In response to this contention the court said that it was not necessary to show a paper title, since "under the showing made in the proof of continuous, adverse possession of the property for a period of more than 20 years" a grant would be presumed and the complainants thus became entitled to maintain ejectment just as if a deraignment of title from the state had been made, or a continuous, adverse possession under color of title for the statutory period." It was in this connection that the court made the pronouncement upon which the complainant relies. This is as follows:

"That the land in question because of the inroads of the river became untenantable, and they were consequently forced to abandon the same, did not have the effect of divesting title out of them. It is well settled that where land becomes submerged by reason of erosion, or from some other cause, title thereto is not lost, and when the same reappears, either by accretion or reliction, the original owner is entitled to take possession of and hold the property reclaimed. Angell, Tidewaters, 76, 77; Mulry v. Norton, 100 N. Y. 424, 3 N. E. 581, 53 Am. Rep. 206; City of St. Louis v. Rutz, 138 U. S. 226, 11 S. Ct. 337, 34 L. Ed. 941-950."

This is followed by a quotation from Judge Lurton's opinion in Stockley v. Cissna, to substantially the same effect.

It is first to be noted that the foregoing quotation manifestly contemplates a case where land was submerged and the identical land reappeared, rather than a case where, by the process of erosion the soil is transported beyond the boundaries, its identity lost and new land formed by the process of accretion in the place of the old.

We have already discussed at length the cited case of Mulry v. Norton, in which the above quoted proposition seems to have originated and shown that in the subsequent case of In re City of Buffalo it was limited in its application to cases of avulsion. We proceed to examine the other citation. That case, City of St. Louis v. Rutz, supra, is referred to in State v. Muncie Pulp Co., supra, 119 Tenn. at page 82, 104 S. W. 437. It was brought to recover an area of land that was formed by deposits of soil on the bottom of the river. The defendant City claimed the land as an accretion to an island owned by it. As to this, the court said [138 U. S. 226, 11 S. Ct. 346] :

"As the law of Illinois confers upon the owner of land in that state which is bounded by, or fronts on, the Mississippi river, the title in fee to the bed of the river, to the middle thereof, or so far as the boundary of the state extends, such riparian owner is entitled to all islands in the river which are formed on the bed of the river east of the middle of its width. That being so, it is impossible for the owner of an island which is situated on the west side of the middle of the river, and in the state of Missouri, to extend his ownership, by mere accretion, to land situated in the state of Illinois, the title in fee to which is vested by the law of Illinois in the riparian owner of the land in that state."

The locus in quo had been formed in an area that had been previously washed away by the river and it was

found as a fact that such washing away of said river bank "did not take place slowly and imperceptibly" but on the contrary, the caving in and washing away of the same "was rapid and perceptible in its progress," etc., thus making what appears to have been regarded as a case of avulsion rather than one of erosion.

It was also expressly found as a fact that "The dry land in question was formed on that part of the bed of the river which was owned in fee by the plaintiff or his grantor as the riparian owner, and that their rights were governed by the established rules of law in force in Illinois." "It is well settled", said the court, "that the owner in fee of the bed of a river, or other submerged land, is the owner of any bar, island, or dry land which subsequently may be formed threeon."

It was accordingly held that the plaintiff as the owner of the fee upon whiih the land was formed, to-wit, the bed of the river, was entitled to the new land "notwithstanding a part of it extended further westward than the boundary of his dry land in 1865." "It was formed", the court continued, "upon that part of the bed of the river which was owned in fee by Blumenthal and the plaintiff, and continued in such ownership after it became dry land."

It is apparent therefor that the decision in that case turned upon the facts (1) that the land which formerly occupied the area in which the alluvion formed was washed away not by erosion but by what amounted to an avulsion; and (2) that the locus in quo was reformed in that area by accretion to land owned in fee by the claimant thereto.

It may be noted also that the law of Illinois differs from the law of Tennessee in that under the former a riparian proprietor owning land on a navigable stream

owns the title in fee to the bed of the river, to the middle thereof, whereas in Tennessee such a proprietor owns only to low water mark, the title to the bed of the stream being in the state in trust for the public; and this is true whatever changes may occur in the course of the stream. Posey v. James, supra; State v. Muncie Pulp Co., supra.

Incidentally, in the Rutz case the court recognized the distinction we have hereinabove sought to emphasize. This is recorded in the following language:

"It is contended by the defendant, not only that the plaintiff never had any title to the bed of the river, but that when the dry land of which he was in possession was swept away by the river, and ceased to exist, his ownership of that land also ceased to exist. It is laid down, however, by all the authorities, that if the bed of the stream changes imperceptibly by the gradual washing away of the banks, the line of the land bordering upon it changes with it; but that if the change is by reason of a freshet, and occurs suddenly, the line remains as it was originally."

We think the citation of the Rutz case by our court in Keel v. Sutton, supra, indicates what the court had in mind in stating the proposition for which that case is cited as authority. The determinative principle underlying the decisions in both of these cases it seems to us is that the owner of the fee is by virtue of that ownership entitled to any alluvial formation created by deposits either upon or against the land so owned. Just as in the Rutz case the locus in quo was formed on the bed of the river to which the plaintiff held title and thus belonged to him; so in the Keel case the land in controversy was formed by a process of accretion against the "narrow strip of some 5 or 6 acres" of which the court held the complainants in that case were the owners in fee.

We think that the vital discussion between the facts in both the Keel and the Rutz cases, and the case at bar, is that, whereas in the former land in controversy formed upon or against the fast land owned by the respective complainants, in the present case the locus in quo accreted not to land owned by the complainant but to that owned by the defendants. We have concluded therefore that this distinction warrants the view that the Keel case is not controlling authority in favor of the complainant in the instant case.

Another theory distinguishing the decision in the Keel case suggests itself. This is that the court considered the facts to present not a pure case of erosion and accretion but a case of a mere emergence by reliction of land to which the complainant held the title. This is indicated by the following from the opinion: "It is also the law that the lapse of time during which the land is covered with water does not prevent the original owner from reclaiming the same and asserting the priority thereto when it reappears." For this the court refers to State v. Muncie Pulp Co., 119 Tenn. at pages 130, 131, 104 S. W. 437, and Stockley v. Cissna, 119 Tenn. at pages 175, 176, 104 S. W. 792. As already emphasized, both of these cases involved the consequences of avulsion and the emergence of land by reliction which followed as a direct consequence of that phenomenon. It cannot be said, we think, that either of those cases inolved accretions except perhaps in so far as they were the direct consequence of avulsion.

We find it impossible to reach the conclusion that the court in the brief opinion in Keel v. Sutton intended to abandon the distinction between the law applicable to erosion and accretion, and that applicable to avulsion followed by accretion, which is so pointedly emphasized

in the memorable opinions in State v. Muncie Pulp Company and Stockley v. Cissna.

 From what has been said it will be observed that in its last analysis the question presented in this case is whether the title to riparian lands is lost by erosion as contra-distinguished to avulsion. Looking through the conflict in some of the generalizations by the courts, which we think more apparent than real, it seems to us to be uniformly held that the title to riparian land on a navigable stream is extinguished by erosion. If new land is thereafter formed by accretion to a portion of the land that was not lost by erosion, the owner holds the new formation, not by his original title but under the law of accretions. As pointed out, precisely the contrary is true in the case of an avulsion followed by reliction.

To sustain the complainant's contention in this case, it seems to us would be to collide with the reasoning underlying the law of erosion and accretion. This has been sad to be as follows:

"No engineering skill is sufficient to say where the earth in the bank washed away and disintegrating into the river finds its rest and abiding place. The falling bank has passed into the floating mass of earth and water, and the particles of earth may rest one or fifty miles below, and upon either shore. There is, no matter how rapid the process of subtraction or addition, no detachment of earth from the one side and deposit of the same upon the other." State of Nebraska v. State of Iowa, supra [143 U. S. 350, 12 S. Ct. 399].

See also State v. Muncie Pulp Co., supra.

 That is precisely the situation under the undisputed evidence in this case. The complainant's property was lost by the gradual and imperceptible process of erosion and no man can say what became of it. The bed

of the river, after it had occupied the place where portions of the original tracts formerly laid, belonged to the public, and the river was a public highway. The accretions thereafter formed by the change in its course due to erosion belonged to the riparian owners under the law of accretions, and not by virtue of the conveyances under which they held the shore to which the new land accreted.

This conclusion, it seems to us, is supported no less by the practical aspects of the matter than by authority. Riparian rights are vested rights. They include the right to future alluvia, the right to access to the navigable part of the river upon the front of the ripa, the right to make a public or private landing, wharf or pier. City of St. Louis v. Rutz, supra, 1 R. C. L. 233, 234, 27 R. C. L. 1070, 1071. To hold with the complainant in this case would be to say that notwithstanding the defendants' land became contiguous to the river and remained so, for a period of several years they did not become vested with the rights of a riparian proprietor, except provisionally, depending upon whether subsequent accretions extending within the boundaries of the complainant's title cut their land off from the river. The practical aspects of such a conclusion support the authorities in forbidding its acceptance. ''It would result in intolerable confusion and public inconvenience'', said the court in In re City of Buffalo, supra, ''to hold that in such circumstances the former owners have a perpetual right of reclamation. If that were the law there would be an end to riparian improvements, for no riparian owner could ever be certain of his tenure or title. No upland owner could ever be sure of his access to the water or free from doubt whether such access were a permanent legal right or a mere temporary privilege enjoyed by

sufferance. It is obviously a rule of necessity and justice that the loss of land by erosion carries with it all incidents of ownership. Welles v. Bailey, 55 Conn. 292, 10 A. 565, 3 Am. St. Rep. 48; Nixon v. Walter, 41 N. J. Eq. 103, 3 A. 385.''

This line of reasoning, it seems to us, applies with peculiar force to lands lying in the valley of the mighty but fickle Mississippi, whose vagaries are a constant threat to the status quo.

It follows therefore that under the law of accretions, the defendants acquired title to all of the newly formed land which accreted to their shore and lies within lines running from the termini of their upland lines at right angles to the low water mark. Welles v. Bailey, supra. The applicable rule is ''in general, the lines of division are to be made to the channel in the most direct course from the lateral boundaries of the several tracts of upland to which the flats (alluvion) are appended.'' Gould on Waters, sec. 162; see also, Doebbeling v. Hall, supra.

The defendants claim no more than this. They assert no right to that part of the alluvion which formed against the 7-acre remnant of the 130-acre tract which was not washed away. This is owned by the complainant; not by reason of any title papers she holds but by the law of accretions.

It follows from what has been said that the complainant has failed to show that she has the title to the land in controversy and hence cannot maintain her suit in ejectment.

This conclusion renders immaterial the several subordinate contentions made by the defendants. These have been set out and discussed in a contemporaneous

memorandum and a reference to them here is unnecessary.

The result is that we think the chancellor erred in decreeing for the complainant. That decree is accordingly reversed and the bill dismissed at the complainant's cost.

Baptist, J., concurs.

Ketchum, J., dissents in part.

Ketchum, J. (dissenting).

I find myself unable to agree entirely with the conclusion reached in the prevailing opinion, though I do concur in the conclusion reached in respect to the principal matter of law involved: that is, as to whether the accretions to the Prevow 101-acre tract extended beyond his original west boundary line. I agree that the original property lines were obliterated entirely by the gradual encroachment of the river to the east with the result that the Prevow land which was originally nonriparian became riparian land; and that the accretions which were subsequently formed thereto embraced a part of the Cunningham tract as completely as if there had never been any line of division between the two tracts. But, I am of opinion that the accretions to Mrs. Cunningham's 7-acre tract and to the Prevow tract are embraced within lines running at right angles from the old bank of the river, as shown on the following plat:

In Welles v. Bailey, 55 Conn. 292, 10 A. 565, 567, 3 Am. St. Rep. 48, which is a leading case on the subject we have under consideration in this case, and which is relied upon and quoted from in the prevailing opinion, the court said:

"Whenever a portion of a riparian lot is washed away by the river, the riparian owner becomes entitled to the land under the water so far as the center of the stream, without any reference to the original limit of his land or to his upland lines. He takes whatever front upon the river its changes of bed gives him, and by lines that run from the termini of his upland lines at right angles to the center line of the stream. All the authorities agree in this. Thus in Gould, Waters, section 162, is said that

'Every proprietor is entitled to frontage of the same width on the new shore as on the old shore, and at low-water mark as at highwater mark, without regard to the side lines of the upland. In general, the lines of division are to be made to the channel in the most direct course, from the lateral boundaries of the several tracts of upland to which the flats are appended . . . So, also, in the case of unnavigable streams, which are the property of the riparian proprietors usque ad filum aquae, the side lines are extended to the center of the stream, from the termini on the bank, at right angles with the general course of the river.' Numerous authorities are cited in support of these positions.''

I can see no reason to support the conclusion of the majority that the accretions to the Prevow and Cunningham lands extended due west between parallel lines to the present bank of the river. It would be just as logical to say that they extended due north between parallel lines. The authorities agree that the original property lines are obliterated entirely when the land is washed away by gradual erosion, and that the riparian owners are entitled to the accretions, not by virtue of their ownership of the original title, but because the accretions were formed to their lands. Welles v. Bailey, supra; Yearsley v. Gipple, 104 Neb. 88, 175 N. W. 641, 8 A. L. R. 636, and note at page 641; Doebbeling v. Hall, 310 Mo. 204, 274 S. W. 1049, 41 A. L. R. 382, and note at page 395. And the logical conclusion would seem to be that the riparian owners should own the accretions which form directly opposite their lands, that is, as nearly as may be, at right angles to the bank to which the accretions are formed.

To this extent I dissent from the conclusion reached by the majority.